CORTES CO. *v.* THANNHAUSER *et al.*

(*Circuit Court, S. D. New York.* April 25, 1891.)

VENDOR AND VENDEE—RESCISSION OF CONTRACTS—FRAUDULENT REPRESENTATIONS.

Defendants received an option to purchase mining property in Mexico, from the owners, for $110,000, and authorized an agent to sell the same for that amount, agreeing to allow him two-thirds of any excess he might obtain over that price. The agent entered into negotiations with certain persons in New York city, which resulted in the formation of a syndicate to organize a corporation for purchasing the property. The agent agreed with the promoters to sell the property for $150,000, and to subscribe and pay for two-tenths of the purchase money himself as one of the promoters. The corporation was organized, and the agent subscribed for stock to the extent of his part·of the purchase money. He was irresponsible at the time, and known to be so by the defendants. He had represented to the other promoters that the price which the defendants were to pay the owners for the property was $150,-000, less a small commission of about $2,500; that the whole price, less this commis-

sion, went to the owners; and that the defendants were interested only as creditors of the owners and to the extent of the commission. Before the corporation received a conveyance of the property its officers discovered the falsity of the representation made by the agent of the defendants, and notified defendants that the corporation would not accept a conveyance. In the mean time the agent, acting under a power of attorney from the corporation, had gone into possession of the property, and, in conducting mining operations there, had created debts against the corporation. The defendants knew that he had no authority to contract liabilities for the corporation beyond the amount of letters of credit which were to be furnished him by the company; but they advanced at his request about $30,000 upon drafts drawn by him upon the corporation. The corporation promptly offered to surrender possession of the property to the defendants, and upon their refusal abandoned possession. The defendants brought suits at law, one to recover the purchase price of the property, and another to recover for their advances upon the drafts. Thereupon the corporation filed this bill in equity to restrain the prosecution of the suit at law, and annul the agreement of purchase. *Held:* (1) Complainant was entitled to rescind the purchase because of fraudulent representations of defendants' agent, though defendants themselves were innocent of fraud. (2) It is the duty of a promoter towards his associates to make full and fair disclosure of all facts within his knowledge which if known would probably lead to an abandonment of the enterprise. (3) That the agent sustained a fiduciary relation to his co-purchasers, and his false representations entitled them and the corporation to rescind the agreement of purchase. (4) Defendants cannot be made liable for the expenses of organizing or conducting the corporation, although the purposes of its organization failed by reason of the fraud of the defendants' agent. (5) The complainant is liable to the defendants for the moneys advanced on the drafts of the agent to the extent of letters of credit given to him by the corporation, but no further.

In Equity.

*L. E. Chittenden,* for complainant.

*Jesse W. Lilienthal,* for defendants.

WALLACE, J. The complainant brings this suit in equity to restrain the prosecution of certain actions at law brought by the defendants in this court to recover the purchase price of certain mining property bought by the complainant of the defendants, and moneys advanced and paid out by the defendants for complainant. The bill proceeds upon the theory that the complainant was induced to purchase the mining property by fraud, and that the claims of the defendants for moneys advanced grow out of transactions consequent upon the purchase. The complainant insists that the matters alleged in its bill are a good equitable defense to the actions brought by the defendants. This contention was sustained by Judge BLATCHFORD, who, in 1882, heard a motion for an injunction *pendente lite,* and granted the injunction, conditioned upon the filing by complainant of stipulations authorizing the defendants to take judgments for such recoveries in the suits at law as might be adjudged in their favor in the present suit.

The facts established by the proofs are as follows: Prior to June 30, 1879, Messrs. Dauriac, Vermot & Ernst were the owners of certain mining property situate in the Valle Perdido district of Lower California, about 45 miles distant from La Paz, the capital of the district, and a sea-port on the Pacific coast. The mining property, which for convenience may be called the "Valle Mines," consisted of several mines on different veins, with machinery, buildings, and supplies. June 30, 1879, the owners executed to the defendants a bond, which was in legal effect an option, whereby, upon the payment by defendants of $110,-000 on or before January 1, 1880, they agreed to convey the property to

defendants by a good and sufficient deed with the usual covenants of warranty. The defendants were bankers at San Francisco, and had made advances to the owners. The owners had not been successful in their mining business, and were in debt to the defendants and to others. The bond was given in the expectation that one Henry S. Brooks, who was a friend of the owners, and also of the defendants, would negotiate a sale of the property. Subsequently it was agreed between the defendants and Brooks that the latter should proceed to New York city, at the expense of the defendants, and endeavor to sell the property at a price of not less than $110,000, and that, in the event of a sale, Brooks should have two-thirds of any sum realized beyond that price. In order to exhibit Brooks' authority to sell the property the defendants executed to him a bond, dated July 25, 1879, giving him an option to purchase the property at any time prior to January 1, 1880, at the price of $160,000; and at the same time they delivered to him a letter of the same date, giving him full authority to dispose of the property at that price, and containing also this statement:

"We consign to you this property, with all our rights and title, being in substance the same as those stipulated in your bond, in virtue of a bond executed to us by the owners dated June 30, 1879, and expiring January 1, 1880, certified by a notary public and the Mexican consul, a duplicate of which will be sent by the steamer Newberne, sailing August 5, 1879, to La Paz, to be legally recorded."

Brooks arrived in New York city in August. In October he met the members of the firm of Hatch & Co., Wall-Street bankers, and some of their friends, including L. E. Chittenden, who was the counsel of Hatch & Co., and a lawyer of exceptional familiarity with the conditions of mining enterprises. After several interviews Brooks entered into a contract with Hatch & Co., of the date of October 28, 1879, executed by him as attorney for the defendants, whereby the defendants gave Hatch & Co. an option to purchase the mining property on or before January 1, 1880, at the price of $160,000. The contract provided that Hatch & Co. should cause the property to be visited and examined by an agent. in their own interest without any avoidable delay, and, if the result of such examination should be satisfactory, and should verify and confirm the statements made to them respecting the situation, value, and promise of the property, they should give notice to the defendants of their election to purchase the property, and in that case should make the payment or deposit of $160,000, and receive a good and sufficient deed with the usual covenants conveying the property in fee-simple and free from all incumbrances. The contract also provided that the defendants would use their influence with the beneficial owners of the property to extend the time for making payment and completing the sale, not exceeding two months beyond January 1, 1880, and that Hatch & Co. might at any time before the actual payment of the purchase price rescind and cancel the agreement to purchase. When this contract was made Hatch & Co. knew that the only title of the defendants to the property was a bond executed to them by the owners, the letter from

defendants to Brooks of the date of July 25th having been exhibited to them, as well as the bond executed to Brooks by the defendants. Contemporaneously with the execution of the contract Brooks delivered to Hatch & Co. a written stipulation, whereby he promised that the commission of $12,500 accruing to him on the sale of the property should be divided between Hatch & Co. and the persons they might associate with themselves as a company or syndicate in completing the purchase; that he would assume two-tenths of the purchase and provide two-tenths of the purchase money if it should be thought best that he should take an interest and become an officer of the company which should be organized; that one-tenth of the stock of the company should be issued to Hatch & Co. as their compensation for forming a company and completing the purchase, and another tenth to Mr. Chittenden as his compensation; and that he, Brooks, would place such mines as he then owned on the San Antonio lode to the joint account of Hatch & Co. and himself. Brooks informed defendants by telegrams that he had closed negotiations for selling the property for $160,000, less $12,500 commission. In November, Chittenden, as the agent for Hatch & Co., mentioned in the contract, visited and examined the property in Lower California, accompanied by Brooks. While he and Brooks were at the mines, and on November 15th, Brooks procured from one of the owners of the property, who assumed to act in behalf of all, a written consent to extend the time of the option until March 1, 1880. While at the mines, and on November 26, 1879, Chittenden wrote to Messrs. Dauriac, Vermot & Ernst as follows:

"On the eve of my departure from this place, and after as thorough an examination of the mines and ores upon your property as their present development has enabled me to make, I take pleasure in saying that I shall inform the parties in New York at whose request I came here that in my judgment the property fully sustains, and in many respects surpasses, the statements made by your representative in New York, and that I shall recommend its purchase. I desire to add that I am much pleased with your own acts and treatment since I came to the Valle. You have given me every facility for my investigation, and have answered all my questions with candor and intelligence."

Chittenden returned to New York about January 1, 1880. He made a favorable report to Hatch & Co. respecting the property in writing. Among other things, this report stated that the cost of the improvements, including machinery and buildings, made upon the property by the present owners had probably exceeded $100,000. In referring to Brooks the report states that he had offered, if a company were formed, with a proper capital, to work the mines, and not speculate in the stock, to take and pay for upon equal terms with others such portion of the stock as might be desired, and to return to the Valle for a period of four or six months to organize the enterprise, etc.; but that this offer was made upon condition that a competent manager, having the confidence of the shareholders, should have exclusive charge of the finances of the company. Brooks returned to New York shortly after Chittenden. Thereafter Hatch & Co. concluded to form a syndicate and or-

ganize a corporation to acquire and work the property; and it was arranged between them and Brooks that the price of the property should be $150,000 to Hatch & Co., and that the property should be conveyed by them to the syndicate or corporation for that sum and one-sixth of the stock of the corporation. It was also arranged between them that Brooks should place $40,000 or $50,000 of the syndicate subscription, and they should place the balance. Thereafter a subscription agreement was prepared by Hatch & Co., whereby they agreed with each subscriber thereto to sell and convey the property to a company to be organized by the subscribers for the sum of $150,000 in money and one-sixth of the capital stock of the company to be formed to own and work the property. Between February 10th and 28th the syndicate of purchasers had been formed, and the subscription agreement signed for the whole purchase money; Brooks, who had in the mean time placed $10,000 of the subscription with another person in New York, subscribing $40,000 for himself, and Hatch & Co., Chittenden, and their friends subscribing the balance. Hatch & Co. and the other members of the syndicate were induced to become purchasers of the property largely by confiding in representations made by Brooks respecting his mining operations at Triunfo, a place about 10 miles distant from the Valle property. He represented to them that he had built up at Triunfo from a small beginning an extensive and successful mining establishment, and had remained there about 14 years; that he had invented new machinery and processes, and opened many mines; that the business no longer required his personal attention, and he had turned it over to the charge of an agent, and removed to San Francisco. He stated that he was not a seller of mines, but wanted to induce a few influential men in the east to join him in taking up a new enterprise in that part of Lower California; that the Valle property afforded an opportunity to invest a small sum which would pay dividends almost from the start, and would demonstrate what could be done in that region; and that he proposed to become a purchaser on the same terms with the others, and would give his associates the benefit of his experience in promoting the success of the enterprise. He said the owners of the Valle property were incompetent mine managers, had adopted wrong processes, had become involved in debt, and had quarreled with each other, and that he, as their friend, had induced them to agree to sell; that with great difficulty he had got them to consent to sell for $160,000, but in this price there was an allowance of $12,500 for commissions, which would be shared among the purchasers. He stated that the defendants had no interest in the property except their debt and an ordinary business commission on the sale.

February 28, 1880, the Cortes Company was organized by the syndicate as a New York corporation, pursuant to the statutes of New York, and its first corporate meeting was held upon that day. Its capital stock was fixed at $1,500,000, divided into 50,000 shares, and Chittenden was elected president and Brooks vice-president. Shortly thereafter Brooks assigned to Hatch & Co. the bond executed to him by the defendants of the date of June 25, 1879, and Hatch & Co. assigned this

bond, together with the contract of October 28th between themselves and the defendants, to the company; and Hatch & Co. entered into a covenant with the company that it should be placed in possession of the property under a good and sufficient title, and under a deed containing the usual covenants of warranty. Thereupon the whole capital stock of the company was issued and delivered to Hatch & Co., and by them distributed among the members of the syndicate according to their respective interests, Brooks receiving 10,000 shares. February 28th, pursuant to instructions of the company, the president sent the defendants a telegram as follows:

"The Cortes Mining Company accepts sale of mining property, payment to be made when in possession under good title. Can make a small remittance to bind contract."

The next day the defendants replied by telegram, stating that they would advise Dauriac, Vermot & Ernst to prepare title for the Cortes Mining Company, and that the small remittance was not required. At this time the defendants had not been fully informed by Brooks of what had taken place in New York between himself and the other members of the syndicate; but they·had been informed in substance by telegrams from him that the Cortes Company had been organized to acquire the property; that the subscription for the purchase had been signed, that the purchase price was $150,000, and that Brooks had subscribed for $40,000 of the price. Brooks was irresponsible pecuniarily, and the defendants knew it, and they understood that the $40,000 which he had subscribed would have to be deducted from the $150,000, the purchase price of the property, and that they would have to be content with receiving $110,000 for the property, or treat the fruits of this subscription as the profit to be divided between him and themselves upon the sale, two-thirds of which would belong to him. Immediately upon learning by his telegrams that the property had been sold upon terms by which they would receive only $110,000 in money, they undertook to procure a modification of their contract with the owners, and in this behalf one of them took the steamer for La Paz, which sailed March 3d, and visited the owners at Valle Perdido. While there he induced the owners to accept $80,000 in lieu of the $110,000 which they were to receive by the terms of their original contract with the defendants; but to obtain this reduction he had to pay to Ernst, secretly, the sum of $3,000, to induce him to consent to it, and he also had to assume the payment of certain debts of the owners, amounting to about $7,300. It had been understood between Brooks and the others of the syndicate that he would superintend the operations at the mines, without compensation, until the business should be properly organized; and as soon as the company was incorporated it was definitely arranged between him and the officers that he should go so as to reach La Paz by the steamer Newberne, which would sail from San Francisco early in April. March 1st the company notified the defendants by telegram that its agent would sail on the Newberne in April, and should be placed in possession of the property, and instructed them meanwhile to follow Brooks' instructions. On or about

March 8th Brooks left New York for San Francisco and Valle Perdido.
He carried with him a written letter of instructions from the company,
authorizing him to receive the title to and take possession of the mining
property for the company.    The letter contained also the 'ollowing
clause:

"It is our wish, and on this subject we would give definite ins ructions,
that no debt of any character be incurred in the company's name beyond the
amount of the letters of credit or other written authority with which you are
now furnished, or which may be hereafter furnished to you or our business
manager.    If at any time, or by any accident, this sum or sums should prove
insufficient, you are instructed to suspend the works of the company until re-
ceipt of further instructions."

He carried with him also a letter of credit addressed by the company
to the defendants, dated March 4th, authorizing him to draw his drafts
at five days' sight on the treasurer in such amounts as he might find nec-
essary in the business of the company.    He also carried with him a let-
ter prepared by the president of the company, which he was instructed
to deliver to the defendants for their signature.    This letter was addressed
to the president of the company, and read as follows:

"As soon as it can conveniently be done after the arrival of your agent, Mr.
Henry S. Brooks, in Lower California, a deed conveying the property known
as the '.Valle Perdido,' as granted to and held by Messrs. Dauriac, Vermot &
Ernst, with all the machinery, improvements, and personal property thereon,
will be executed to the Cortes Company, and Mr. Brooks will be put into pos-
session thereof for said company, in conformity with the laws of the country
where the property is situated.    The deed will be forwarded to our agent in
the city of New York, with instructions to deliver the same to you upon pay-
ment of the purchase money.    The original price was $160,000.    Mr. Brooks
informs us that the commission of $10,000 has been waived, and instructs us
to provide here for the amount of his subscription, $40,000.    You will there-
fore receive the deed of the property from our agent on paying to him the sum
of $110,000.    Reasonable notice of our willingness to deliver the deed will be
given to you, and our agent so instructed to consult with you, and to arrange
for the payment of the money."

Brooks arrived in San Francisco March 19th.    He presented to the
defendants his letter of instructions, the letter of credit, and also the let-
ter which the president of the company had prepared for their signatures.
The defendants signed the latter letter, and mailed it to the company.
Brooks remained in San Francisco until April 3d, when he sailed by the
steamer for La Paz.    While he was in San Francisco, and on or about
March 30th, he received from the company a formal power of attorney,
which had been prepared before he left New York, but had not been de-
livered to him, authorizing him to take title to and possession of the
mines, and do all acts and execute all papers which he might deem
proper to vest and confirm the title of the Cortes Company to the prop-
erty.    Before he left, he and the defendants came to an understanding,
by which they were to advance $8,331 towards the working capital of the
company, as the proportion to be contributed for his 10,000 shares.
April 19, 1880, Brooks having reached Valle Perdido, Messrs. Dauriac,
Vermot & Ernst executed to him as agent for the company, documents

of title conveying the property to the Cortes Company, and Brooks took formal and actual possession. The documents were forwarded to the defendants. The defendants forwarded them to Seligman & Co., their agents at New York, with instructions to deliver them to the company upon receiving payment of $110,000; and the company was duly notified by the defendants by telegram and letter. The day the document reached Seligman & Co.,—June 2d,—the company received a letter from the defendants, stating that the defendants had on May 25th indorsed two drafts drawn by Brooks on the company, one for $6,000 and the other for $8,300. At the same time the company received letters from Brooks, and a translation of the documents of title, which were in the Spanish language. The translation disclosed that Dauriac, Vermot & Ernst had received $80,000 for the property, and that the property was not worth more than that sum, and the letters that Brooks had drawn drafts largely in excess of his authority, being in all for about $23,500. The letters from Brooks also informed the company of facts respecting the merits and prospects of the enterprise, and his transactions since he had been at the mines, which strongly tended to impeach his business capacity, his integrity, and the truth of some of the representations made by him as inducements to the purchase. The company immediately sent a telegram to the defendants as follows:

"Consideration expressed in deed is $80,000; consideration in your contract with Hatch $150,000. What becomes of the difference?"

The next day the company received a reply from the defendants by telegram as follows:

"Owners get $80,000; balance for assumption and payment of debts and for supplies on hand at time of transfer, and for traveling and other expenses incurred."

The president of the company immediately wrote to the defendants as follows:

"Although our power of attorney directed plainly otherwise, and the dispatch was sent Mr. Brooks on the eve of sailing that the corporate name was the Cortes Company, and not the Cortes Mining Company, the deed is made to the Cortes Mining Company, and could not on that account be accepted without correction. The deed also contains provisions showing that the consideration paid is $80,000, instead of $150,000, and that the property is not worth more than the smaller sum. These provisions raise a question of the gravest character, and until it is arranged I have no right to recommend the acceptance of the title to our trustees. Should payment be made, there would be a sum of $70,000 for which no consideration appears to be received by the company. The error is unfortunate, and is calculated to create a feeling in the minds of our shareholders that some one between the owners and our company is to make a profit on the sale. The inquiry was frequently made whether there was any profit in this sale to any one, and always promptly met by a negative answer and the statement that the price only just reimbursed the owners for their investment. Your relation to the property was stated to be that of creditors and agents for the owners. A profit to any one on this sale would not only invalidate the sale, but would release our subscribers from their obligation. I can see no better way than to preserve ev-

erything in its present condition until Mr. Brooks arrives by the next steamer, when myself or some one in behalf of the company will meet yourselves and him in San Francisco."

June 11th the defendants replied that they would await the arrival of Mr. Brooks, who was expected about the 22d instant. Since April 19th the company had been in possession of the property, conducting mining operations on an inconsiderable scale, under the supervision of Brooks and of Mr. Wilds, who had accompanied Brooks as general business manager. Brooks left the mines about the middle of June, arriving in San Francisco about June 22d. Thenceforth his connection with the company ceased. Apparently he was broken in body and mind as the result of excessive use of liquor while he had been at the mines. During the short period of his administration as vice-president an account accrued with the defendants arising from advances made for the purchase of supplies for the company upon his order, and from drafts drawn upon the company by him, amounting to over $30,000. Chittenden reached San Francisco July 1st, and had an interview with Brooks, and soon after with the defendants. He remained in San Francisco about a month. In the mean time, having been placed in possession by the defendants of all the letters and documents which had passed between themselves and the mine-owners and Brooks in reference to the purchase, he insisted that the representations made by Brooks that the whole purchase-price was to go to the original owners, and that no one between them and the purchasers was to make a profit on the property, being false, avoided the sale. Various propositions looking to a new contract by which the company might be induced not to rescind the sale were suggested during this time, but no agreement was reached. July 20th Chittenden notified the defendants that he should no longer consider any proposed arrangement except under the advice of the board of directors of the company, and he should await advices. August 2d, having received advices by telegram from the company, Chittenden notified the defendants the company had decided to rescind the contract, and abandon the enterprise. August 3d Chittenden proposed to the defendants that he would instruct the company's general manager, Mr. Wilds, who had been left in charge of the mines since the departure of Brooks, to surrender possession to Mr. Mendoza for the defendants; Mendoza being an agent of the defendants at Valle Perdido. The defendants declined this proposition. On the same day Chittenden notified Wilds by mail to abandon the property, and cease operations. Immediately upon receipt of this letter, and in the latter part of August, Wilds carried out these instructions, and came away. Since that time neither the company, the defendants, nor the original owners have been in possession of the property.

Upon these facts the right of the complainant to rescind the sale is clear. Irrespective of any other element of fraud in the transaction, the false representations of Brooks that the price at which he offered the property was the price which the owners were to receive, and that neither he nor the defendants were to receive any profit by the sale, suffice

to annul the contract made by one who was about to enter into the fiduciary relation of a co-purchaser with those to whom he made it. The materiality of such representations as an inducement for the contract is obvious. The statements led them to suppose that he was willing to risk his money in the enterprise, and was risking it, upon equal terms with them; and that they were obtaining the property upon the best terms that could be made with the owners; whereas, if they had understood that he was not investing any money, and that his contribution was merely a bonus for getting them to buy the property, they might have attempted to get better terms, if, indeed, they would have felt inclined to consider the purchase at all. There is a fiduciary relation between promoters and between a promoter and the company in its corporate capacity which imposes on the former the duty of full and fair disclosure of all facts which, if known, would probably lead to a withdrawal from the enterprise. It is the duty of a promoter towards those who are invited to co-operate in the enterprise not only to abstain from stating as a fact that which is not so, but not to omit to state any fact within his knowledge the existence of which might in any form affect the extent or the quality of the advantages held out as an inducement. *Phosphate Co.* v. *Erlanger*, 5 Ch. Div. 73; *Bagnall* v. *Carlton*, 6 Ch. Div. 371; *Mining Co.* v. *Grant*, 11 Ch. Div. 918, 936; *Railroad Co.* v. *Kisch*, L. R. 2 H. L. 99, 113. As Brooks was the agent of the defendants in selling the property, notwithstanding they were personally innocent of misrepresentation, his fraud is imputable to them. The contract they are seeking to enforce in the suit at law is tainted by his fraud. Their action proceeds upon the theory that he was their agent in making the sale; and they cannot repudiate his acts while seeking to obtain the fruits. They were entitled by the agreement with him to share the profit arising from the sale, and to claim one-third of the stock represented by the subscription. The theory that his agency terminated before the transaction was consummated is too preposterous to require notice.

The complainant offered to rescind in due season, and did all in its power to restore the defendants to the position which they occupied at the time of the sale. In the absence of any evidence as to the law of Mexico, inasmuch as the documents of title were never delivered to the complainant, but were left in the hands of the agents of defendants at New York city, awaiting payment of the purchase money, it must be assumed that the complainant did not acquire any documentary title to the property. Consequently it was not incumbent on the complainant to tender a reconveyance, and the surrender of the possession of the property, with notice to the defendants, was a sufficient offer of rescission.

The complainant insists that the defendants should be held responsible for the expenses incurred in the organization of the corporation, and in its administration, including the services of its officers and agents, because these expenses were the direct result of the fraud committed by Brooks. Brooks was the agent of the defendants merely to sell the property. If the purchasers chose to incur unnecessary expenses with a

view of capitalizing their investment and managing it through the instrumentalities of corporate organization, that was not the affair of the defendants; and the losses incident thereto are not the direct or immediate consequences of any acts of Brooks for which they are accountable.

The demand of the defendants for money advanced and paid out for the company pursuant to the request of Brooks as vice-president, and while he was in charge of its affairs at the mines, is a valid claim against the company to the extent to which Brooks was authorized to obtain credit by his letter of instructions. That letter, which was shown to the defendants by Brooks, informed them that he was to incur no debt of any character beyond the amount of the letters of credit or other written authority with which he might be furnished by the company. He was furnished by the company with a letter of credit for $10,000, and that letter was shown by him to the defendants. Had it not been for the limitation as to the amount of debt which he was authorized to incur, the defendants would have been justified, so long as they acted in good faith, in dealing with him as with a general agent of the company. He was the *alter ego* of the company at the mines, carrying on operations there which necessitated large monthly expenditures for supplies and wages; and the defendants, as the bankers at San Francisco of the company, would have been authorized to advance moneys upon his drafts, and pay for supplies ordered by him apparently in the legitimate business of the mines. If the defendants had shown that the company in any way got the benefit of the moneys which they advanced in excess of $10,000, they would be entitled to recover the excess. As it is, they can only recover to the extent of $10,000, and from that amount is to be deducted the draft of $4,209 which had been paid by the company. A decree is ordered for the complainant, annulling the sale, and staying further prosecution of the suit by the defendants to recover the purchase price. Pursuant to the stipulation filed by the complainant and by the persons composing its board of trustees, the defendants are entitled to judgment in the other actions at law for the sum which has been indicated, and the decree in this suit will so adjudge, and will provide for a stay of prosecution of those actions, except to collect that sum and the taxable costs of the suits.