# TYLER *v.* SAVAGE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

No. 158. Argued January 18, 1892. — Decided February 1, 1892.

A decree in a suit in equity found that T., an individual defendant, and the remaining assets of a corporation defendant, were liable to the plaintiff for the sum of $10,000 paid by him into the treasury of the company at the instance of T., for a certificate of stock therein, which company was represented to him by T., who was its president, to be in a flourishing condition, when in fact it was insolvent; and distributed $176.24 as the remaining assets of the company, of which $13.24 went to the plaintiff as a credit on his claim for $10,000; and decreed that T. pay to the plaintiff $10,000, subject to a credit of the $13.24. There was no demurrer

OCTOBER TERM, 1891.

to the bill for multifariousness, and no objection taken in the court below for want of equity. The bill set out fraud in T., and that the $10,000 was due to the plaintiff by T. and the company, and required answers to interrogatories, which answers referred to the books of the company for information: *Held,*

(1) To support jurisdiction in equity, there were in the case discovery, account, fraud, misrepresentation and concealment; the objection to the jurisdiction was not taken in the court below; and the case was *not* one of a plain defect of equity jurisdiction, under § 723 of the Revised Statutes;

(2) The decree was not outside of the case made by the bill, but gave relief agreeable to it, under the prayer for general relief;

(3) The evidence sustained the decree, and the report of a master, finding in favor of the plaintiff the facts on which the decree was based, was not excepted to by T.

THE court stated the case as follows:

This is a suit in equity, brought in the Circuit Court of the United States for the Eastern District of Virginia, by Sarah C. Savage, a citizen of Pennsylvania, who sues for herself "and all others, creditors of the Virginia Oil Company, who will make themselves parties to this suit on the usual terms," against the Virginia Oil Company, a Virginia corporation; John Tyler, president of said company, and in his own right; John W. Otley, C. W. Tanner, Isaac Davenport, Jr., J. H. Montague, C. E. Belvin, late directors in said company, and citizens of Virginia; and Joseph D. Evans and J. F. Crane, citizens of New York.

The bill, which was filed December 11, 1885, so far as it is material to give its contents, set forth that the plaintiff, being anxious to secure a business position for her son, H. C. Savage, was referred by William E. Tanner, of Richmond, Virginia, with whom she had business transactions, to John Tyler, president of the Virginia Oil Company, of which company C. W. Tanner, a son of William E. Tanner, was a member; that through William E. Tanner she opened negotiations with Tyler, and was informed that she could secure for her son a position equivalent to that of assistant secretary in the company, by the investment of $10,000; that she was willing to make that investment in the shape of a loan well secured, but

Tyler declined to take the sum as a loan, and required that she should purchase of the company that amount of its capital stock at its par value; that, to induce her to purchase the stock, Tyler, as president of the company, sent to her the following letter:

"VIRGINIA OIL COMPANY,

"RICHMOND, VA., *April* 10*th*, 1884.

"Mrs. S. C. Savage.

"MY DEAR MADAM: Your favor of the 9th is rec'd. During the short interview I had with your son I concluded that he could easily undertake the duties that would be required of him in the employ of this company. With regard to the nature of the investment conveyed in the proposition thro' Col. Tanner, I would say that we have no trouble in borrowing all the money necessary for the conduct of the business upon its present basis, but the proposition to you embraced the idea, (which we had been considering,) of permanently enlarging the scope of our business by increasing our capital stock and getting additional office help. You will readily appreciate the difference to a man'f'g business between borrowing money, which may be called for at the pleasure of the lender, and having the same am't in the shape of a permanent investment, so we concluded that whatever arrangement was made in this direction must be upon a stock basis.

"As to the condition of our Co., the capital stock is at present $18,300, with authority from the stockholders to increase it to $30,000. The last dividend that was declared was a 7% semi-annual. The fiscal year ends on the first of June.

"The prospects of our Co. I consider flattering. We have in the past few months decreased our expenses and the outlook for business is better than ever before.

"Our products are sold North, South & West, and the field we are working is so wide that we could without much risk double our business by adding moderately to our capital. Our manufactures pay a large profit and are favorably known throughout the territory we have travelled. As to your chances of selling your stock at par whenever you might wish, I can only say that a gentleman of New York has bought 30

shares at par within the last ten days, but a sale of stock in any m'f'g Co. would depend on its profitableness at the time the sale was made. Should our negotiations result in your son's coming with us, I shall personally try to make his position a pleasant one.

     "Very resp'y,       JOHN TYLER, *Pres't;*"

that the plaintiff relied upon the statements made in the letter, and had a right to rely on them, as a basis for the investment of her money; and that the important statements made therein were as follows: (1) The then capital stock of the company was $18,300, with authority from the stockholders to increase it to $30,000; (2) the last dividend declared was seven per cent semi-annual, and the current fiscal year would end June 1; (3) the manufactures of the company were paying a large profit, and were favorably known throughout a wide territory, north, south and west; (4) there had been a late decrease of expenses, and the outlook for business was better than ever before; (5) by adding moderately to their capital, they could, without much risk, double their business; and (6) a gentleman of New York had bought thirty shares of the stock at par within the last ten days.

The bill further averred that, with those statements from the president of the company, she concluded that its stock was a safe investment, and consented to take the stock instead of loaning the money, which was her preference, but which the letter assured her would not suit the company; that thereupon, on May 19, 1884, she paid into the treasury of the company $10,000, and received a certificate for one hundred shares of stock, which she still holds; that, in accordance with her understanding with Tyler, her son was given a position at a salary of $800 per annum, and performed the duties assigned to him until the suspension of the office work; that when the 1st of December, 1884, arrived, she was not informed of the declaration of the semi-annual dividend she had been led to expect, and on the 5th of that month she wrote to Tyler a letter of inquiry concerning it; that in reply she received a letter from him, as follows:

"VIRGINIA OIL COMPANY,
"RICHMOND, VA., *Dec. 8th,* 1884.

"Mrs. S. C. Savage.

"DEAR MADAM: Your favor of the 5th is rec'd. Our company have tho't it wise — as many other m'f'g Co.'s who have not a large surplus of capital have also — in view of the depression in business which causes payments to come in very slowly, to omit a semi-annual declaration of dividend.

"You are mistaken in supposing that the general condition of the finances of the country does not affect our business. It has caused R. R'ds to be months behind in their payments, as well as slack in their orders, on whom the business is largely dependent, but in spite of this the business of the last six months shows a profit over and above expenses.

"You will see, therefore, it is in the interest of all the stockholders that we have prudently determined to avoid weakening our treasury by withdrawing a dividend at this season.

"Hoping this explanation will be satisfactory, I remain —

"Very resp'y, JOHN TYLER, *Pres't;*"

that, when the 1st of June, 1885, arrived she received no notice of dividend and some weeks later received a statement of the business of the company for the fiscal year from June 1, 1884, to June 1, 1885, showing a loss of $3602.47 for the year, and a circular, signed by Tyler as president, making suggestions in regard to reducing expenses, and giving reasons for the depression of business, the reduction of expenses to involve the striking from the pay-roll of a son of Tyler, whose salary was $480 a year, and of the plaintiff's son, whose salary was $800; and that she also received from Tyler a letter dated August 4, 1885, stating that the company owed him between $5000 and $6000, borrowed money, and proposing that, if the plaintiff would assume that debt to Tyler, he would resign his position as president and allow her son to remain in the employment of the company.

The bill also alleged that, for some time before 1881, Tyler and Otley, under the firm name of John Tyler & Co., conducted at Richmond a business in oils, railroad grease, etc.,

and with Tanner, Montague, Davenport and Belvin formed a corporation under the laws of Virginia, known as the Virginia Oil Company, with a capital of not less than $15,000 and not more than $300,000, the stock to be divided into shares of the value of $100 each, to pursue the business of refining and wholesale and retail dealing in petroleum oils, the manufacture and sale of illuminating and lubricating oils, and compounds, including animal, mineral and vegetable oils, the right of prospecting and boring for oils, and the privilege of buying and selling on commission or otherwise crude petroleum and other materials used either separately or in combination for illuminating and lubricating purposes, of which company Tyler was named as president and the other five corporators as directors; that certificates of paid-up stock in the company were issued May 21, 1881, to Tyler, Otley and Tanner, respectively, for 50 shares each, and to Davenport, Montague and Belvin, respectively, for one share each, aggregating 153 shares or $15,300; that on November 12, 1881, 30 shares were issued to Evans, making in all 183 shares; that the books show that no money was paid by Tyler and Otley for their shares, but that the $10,000 of their shares and $1647.15 due by John Tyler & Co. to Tyler, making in all $11,647.15, was balanced by the following items, namely: Amount of inventory turned over, $2450.51; merchandise, balances, $267.55, and cash, $46.50; machinery and fixtures, $395.75; amount of stock allowed Tyler and Otley in consideration of good will, formulas, etc., of John Tyler & Co., $8486.84; total, $11,647.15; that Tyler, as president, Otley, as superintendent, and Tanner, as secretary and treasurer, were each paid a salary, believed to be as much as $1500 per annum apiece, and on June 1, 1882, at the end of the first year, dividends of 20 per cent upon the original capital stock and seven per cent on the shares of Evans, were declared and paid, amounting to $3270; that since that date no dividend had been paid, and now the company was admitted to be insolvent; that on April 3, 1884, Otley's stock was surrendered to the company, and he was paid therefor $2500, being at the rate of fifty cents on the dollar, and his duties and salary as superintendent ceased;

that if that purchase of stock, and the original payments of Tyler and Otley for their stock were permitted to stand, the company was insolvent on April 10, 1884, when Tyler represented it to be in a prosperous condition; that Tyler's letter of April 10, 1884, both by its statements and its omissions, was false and deceitful and operated as a fraud upon the plaintiff, and would cause her to lose the money so obtained from her unless the proper relief should be granted to her; that the mode of settlement for their stock adopted by Tyler and Otley was illegal and fraudulent, and ought to be set aside and they be made to pay for their stock in money; that the pretended sale of good will, formulas, etc., by John Tyler & Co. was in fact a purchase by Tyler from himself, which could not be allowed when he was using the assets of the corporation in the transaction; that the price placed upon that intangible property was fictitious and fraudulent; that now, when the corporation was admitted to be insolvent, not one dollar was estimated as the value of such good will and formulas, in the inventory of the assets made by Tyler; that the taking out of the assets of $2500 by Otley on account of his stock was illegal, and he was a debtor for that sum, with interest; and that any dividend paid to directors and stockholders out of the capital stock of the company made such directors and stockholders liable to the creditors of the company for such dividend.

The bill further alleged that the sum of $10,000 having been unlawfully obtained from the plaintiff "by the misrepresentations of the affairs of the said company by John Tyler, its president and duly authorized agent, and the same having gone into the treasury of, and been expended by, the said company, the said sum, with interest thereon from the 1st day of June, 1884, is justly due her by the said Tyler and Virginia Oil Company, and she has a right to require all the proper assets of the company to be gotten in and to have them applied to the liquidation of the debts due her and others;" that, if any money was due to the company for any part of the subscription of Evans to its stock, both Evans and Crane (the assignee of his stock) were debtors to the company therefor; that the com-

pany was insolvent; and that it was necessary that a receiver of its assets should be appointed.

The bill prayed for answers by the defendants to the following interrogatories: "1. What amount of stock has been issued by the Virginia Oil Company, to whom, and when issued? 2. What was the consideration paid for said stock by the several stockholders, and when and how has it been paid? 3. What sums have been paid to the said stockholders as dividends and when were they so paid and by what authority? 4. What sums have been paid to the several defendants who claim to have been officers of the company and by what authority? 5. Whether any stockholder has surrendered his stock to the company; and, if so, when and what was paid him for the same? 6. What was the statement made to the stockholders, at the end of each fiscal year, of the condition of the company and its business, by the president and directors, or any of them? 7. What meetings of the stockholders have been held, and what were their proceedings at such meetings? 8. How was the money paid in by your oratrix for her stock expended by the company? 9. How and when was the capital lost?"

The bill further prayed for an account of the assets and debts of the company; that the assets be realized as quickly as possible and the funds arising therefrom be paid to its creditors; that the plaintiff's claim to be repaid the money she was induced to pay for the stock issued to her, with interest thereon, be established and be made a debt of the company, and payment of the same be decreed to her; that an injunction be granted, restraining the company and its officers and agents from managing or interfering in its affairs; that a receiver be appointed to take charge of its property and effects, and administer them under the direction of the court; and that general relief be granted and all orders made that the nature of the case might require and to the court might seem meet.

On notice, a receiver was appointed, and all the defendants, except Evans and Crane, were served with a subpœna. Otley answered the bill and the interrogatories, and alleged that he

was not liable to the plaintiff. Tyler entered his appearance as president of the company and in his own right. The bill was taken as confessed against Tanner, Montague and Belvin. Tyler answered the bill, admitting that he wrote the letter of April 10, 1884, averring that everything stated therein as facts was then true, admitting also that he wrote the letters of December 8, 1884, and August 4, 1885, averring that their statements were true and made in good faith, answering the interrogatories, and denying his liability to the plaintiff. Tyler did not challenge the equitable jurisdiction of the court, nor demur to the bill for multifariousness.

The plaintiff replied generally to the answers of Otley and Tyler, and the bill was taken as confessed against the corporation and Davenport.

The receiver reported to the court, on April 15, 1886, that he had not been able to sell the machinery of the corporation, but had disposed of the remnant stock of soaps and oils, and had found that the accounts due the company were almost all uncollectible. He made a statement of receipts and expenditures, accompanied by vouchers, showing no money on hand, and asked to be relieved from his receivership.

On May 14, 1886, an order was made that the suit proceed without service on Evans and Crane, confirming the receiver's report, accepting his resignation and discharging him, appointing another receiver in his place, and referring it to a master to inquire and report, on the testimony of witnesses to be taken and returned by him to the court: "1. What amount of capital stock has been issued by the defendant the Virginia Oil Company, to whom and when issued. 2. What was the consideration paid by each holder for the stock issued to him, and when and how paid, and whether full consideration was paid therefor. 3. What sums have been paid to the several stockholders as dividends, and when, and by what authority, were the payments made; and, if by order of the board of directors or of the stockholders, whether the orders were made at lawful meetings at which there was present a proper quorum. 4. What was the true condition of the company when such dividends were declared, and whether they were paid out

of the profits earned or out of capital or money borrowed.
5. Whether any stockholder has surrendered his stock or any
part of it to the company; and, if so, when and what was paid
him therefor; and what was the condition of the company at
the time as to solvency, and whether the said purchase of
stock by the company reduced its capital to less than the min-
imum allowed by the charter.   6. What sums have been paid
to the several defendants, or any of them, who have acted as
officers of the company, and by what authority; and if by
orders of the directors or stockholders, whether at lawfully
constituted meetings.   7. An account of the assets and liabili-
ties of the Virginia Oil Company, showing any priorities which
exist among the said liabilities.   8. A correct statement of the
condition of the affairs of the company on or about the 1st
June, 1884, when the plaintiff was induced to subscribe for
stock therein, showing whether the said company was solvent
and in a prosperous condition as represented in the letter of
John Tyler to the plaintiff, dated 10 April, 1884, and filed as
Exhibit ' A.' with the bill.   9. Any other matter deemed perti-
nent by the master or required by either party."

The new receiver reported in January, 1887, that in June,
1886, he had sold all the property of the corporation; that the
proceeds of the sale amounted to $367.65; and that he had
received in cash $123.89 and disbursed the whole thereof, and
deposited in the bank to the credit of the court notes for
$248.41.   The court made an order confirming his report and
discharging him.

In July, 1887, the master filed his report as to the nine items
of inquiry referred to him.   He reported that the shares of
capital stock issued by the corporation were, as stated in the
bill, 283 in number, including the 100 issued to the plaintiff;
that the plaintiff paid for her stock on May 19, 1884, although
the certificate issued to her was dated May 31, 1884; that the
consideration paid by Tyler and Otley for their stock was the
good will of the business of John Tyler & Co., " and a number of
valuable recipes and formulas for the manufacture of oils and
grease, together with the stock and fixtures of that business,"
the former valued at $8486.84, and the latter at $1513.16 net;

that the only dividend ever declared by the corporation was made June 1, 1882, of 13 per cent on the capital stock of the company owned by stockholders the first six months of the year, and 7 per cent on that owned by stockholders the last six months of the year; that the corporation was solvent and prosperous when that dividend was declared, and it was paid out of earnings; that no stock was surrendered by Otley to the corporation; that the salaries of Tyler as president, Otley as superintendent, and Tanner as secretary and treasurer, were $100 a month each for the year ending June 1, 1882, and afterwards were $1500 a year each until the business was closed, excepting that Otley's salary ceased on October 16, 1883, when he sold his stock to Tyler; that there was in bank to the credit of the court in the cause, $166.61; and that there were claims against the corporation, which had been presented to the receiver, amounting to $715.83.

As to the inquiry what was the condition of the affairs of the corporation on or about June 1, 1884, and as to whether it was solvent and in a prosperous condition on April 10, 1884, the date of Tyler's letter to the plaintiff, the master reported that, according to a statement made by Tyler, the assets then exceeded the liabilities by $3261.45, but the items of assets in that statement included $5000 for the stock purchased from Otley; that such $5000 ought to be stricken out entirely, or, if the stock was paid for out of the company's money, ought to be reduced to the $2500 actually paid, leaving an excess of assets of $761.45 to represent the whole of the cash-paid stock; but that, as Otley's stock was purchased without authority from the corporation, and the purchase never was approved by it, that item of $2500 also ought to be stricken out, and thus Tyler's statement presented the corporation as having lost its entire cash paid stock and being largely in debt besides; that the formulas and recipes purchased for $8486.84 were then and ever since had been without value or at least unsalable; and that, in a word, the corporation was bankrupt.

The master reported further that on May 19, 1884, the day the plaintiff's stock was paid for, there was paid to a bank in Richmond by the company $5900, of which $4900 went to take

up notes of the company, indorsed by Tyler and Tanner, and $1000 to take up a note of Tyler's, secured by stock of the company; that on May 20, 1884, $300 was paid to Tyler by the company for loans made to it by him in the previous part of that month; that on May 18, 1884, the cash receipts and payments were very nearly balanced; that after that date to the close of that month the receipts were about $320, and, according to Tyler's statement, the amount on hand June 1, 1884, was $246.32; and that it was obvious, therefore, that the large payments above mentioned were made from the money received from the plaintiff.

The master with his report returned the depositions he had taken. The plaintiff filed exceptions to the report, but none of the defendants excepted. The case was heard, and on the 20th of February, 1888, a decree was made which stated that "the court, being of opinion that the defendant John Tyler, individually, and the remaining assets of the Virginia Oil Company, are liable to the plaintiff, Sarah C. Savage, for the sum of ten thousand dollars paid by her into the treasury of the company, at the instance of the said John Tyler, on the 19th day of May, 1884, for a certificate of one hundred shares of stock in said company, which said company was represented to her by the said Tyler, its president, to be in a flourishing condition, when, in fact, it was insolvent, doth so decide, and having caused a statement to be made and filed, marked (R. T.), showing how the fund of $176.24 in the Merchants' National Bank of Richmond to the credit of this cause should be distributed, doth adjudge, order and decree that M. F. Pleasants, the clerk of this court, do draw a check upon the said fund to the credit of the court in this cause in the Merchants' National Bank of Richmond, in his own favor, for the sum of $88 in full of his fees and charges in this cause, and a check upon the said fund in favor of W. W. Henry, attorney for Sarah C. Savage, for $50, the amount of cost paid by the plaintiff in this case, and that he do check upon the said fund for the balance thereof, to wit, $33.24, in favor of the said W. W. Henry, attorney for Sarah C. Savage, of which $20 is the docket fee taxed for plaintiff's attorney, and $13.24 shall be a credit on the said

claim of the plaintiff for ten thousand dollars; and the court doth further adjudge, order and decree that the defendant John Tyler do pay to the plaintiff, Sarah C. Savage, ten thousand dollars, with interest thereon, at the rate of six per centum per annum, from the 19th day of May, 1884, till paid, subject to a credit of $13.24 as of this day, and that the plaintiff be at liberty to sue out execution for the same; and the report of the master is confirmed in all other respects."

The court thus distributed a fund of $176.24 [171.24 ?] in its hands, the proceeds of the property of the corporation, by paying to the clerk $88 for fees, and to the plaintiff's attorney $50 for costs, and $20 as a docket fee, and the remainder, $13.24, as a credit on the claim of the plaintiff for $10,000; and then it ordered the defendant Tyler to pay to the plaintiff $10,000, with interest at six per cent from May 19, 1884, subject to a credit of the $13.24, as of the date of the decree. From this decree, Tyler appealed to this court.

*Mr. Assistant Attorney General Maury* for appellant.

I. The first question to be considered is that of jurisdiction. The only ground on which the bill can be supported against Tyler is, that it contains averments to the effect that Tyler is indebted to the Virginia Oil Company on account of his stock therein, and that what is thus owing by him is a part of the assets of the company, and that the complainant has an equity to compel payment of the amount thus due, and to subject it to her claim for damages against the company.

The only equity the plaintiff pretended she had against Tyler was to demand that he should be compelled to pay for his stock in the Virginia Oil Company in money, it being averred that what had been claimed to be a payment for the stock was largely fraudulent and fictitious.

This contention, so persistently made, was declared by the master to be untenable in view of the facts established before him, and the decree confirms the master's report over the plaintiff's exceptions on this head.

This action of the court and master, from which there is

no cross appeal by appellee, left the case entirely destitute of equity against Tyler, and the bill should have been dismissed. If parties could give jurisdiction in equity to the United States courts by mere averments unsubstantiated by proof, the constitutional guaranty of trial by jury would be worthless. This court carefully protects that constitutional right from invasion by equity. *Russell* v. *Clark*, 7 Cranch, 69; *Parkersburg* v. *Brown*, 106 U. S. 487; *Buzard* v. *Houston*, 119 U. S. 347; *Kramer* v. *Cohn*, 119 U. S. 355. Upon this ground alone it would seem that the bill should be dismissed.

II. The decree is outside the case made by the bill. It was a surprise, as well as an injustice to the appellant, who has as fair a name as any person in the city of Richmond. Indeed, it is noticeable that the decree, in stating the deduction of the court from the evidence, does not state that Mr. Tyler had made false representations to Mrs. Savage, *knowing them to be false*, but merely says that the representations were not true; *but it did not follow, necessarily, that Tyler knew they were not true.* The draughtsman of that decree no doubt thought, and properly, too, that it would be a libel upon Mr. Tyler, from a moral point of view, to make the decree recite that that gentleman had wilfully misled Mrs. Savage; and in this way we may account for the remarkable omission from the decree of that necessary element of the plaintiff's case.

An examination of the bill shows that the complainant proceeded on the theory that the defendants Tyler and Otley owed the Virginia Oil Company more than $10,000 for the 50 shares of stock held by each of them, and alleged to have been paid for in a way that was a fraud on the company and its creditors, and the tenacity with which the complainant clung to this point up to the final decree shows that she and her counsel deemed it to be well founded. The bill also claims that the defendant Otley owes the company the further sum of $2500, with interest, the same being money of the company paid him, illegally, as alleged, by Mr. Tyler, as president of the company, for the purpose of retiring the shares of stock held by him. It is manifest, therefore, that the plaintiff considered that she had in these and other supposed assets of the com-

pany an ample fund for the satisfaction of her demand, and that there was no necessity for pressing any claim she might have against Tyler personally, otherwise than as a stockholder who is alleged not to have paid up his stock. Tyler and the other stockholders were made parties to the bill because they were supposed to be debtors to the company on their stock.

The truth is, no doubt, that it was no part of the complainant's original plan of attack to urge a demand against Tyler for the alleged fraud, and that it was not until the complainant's case against the defendants Tyler and Otley, as debtors to the company, broke down, that an attempt was made to hold Tyler personally responsible for the alleged fraud.

The complainant had no right to urge a demand against Tyler covertly, and thereby throw him off his guard and surprise him at the last moment, when it was too late to demur for multifariousness, and the court will presume from the face of the bill that no such improper course was intended, while every doubt in the bill will be resolved against the complainant, according to the well known rule. Upon this ground, also, the decree is invalid, being entirely outside the case made in the bill.

III. Upon the question of fraud we have to say that after a careful examination of this record, we do not hesitate to say that it is incomprehensible to us how the learned judge below could have felt warranted in putting the stigma of this decree on the appellant, who is among the most honorable and respected citizens of Richmond.

*Mr. William Wirt Henry* for appellee.

Mr. Justice Blatchford delivered the opinion of the court.

It is assigned for error (1) that the record does not present a case for the exercise of jurisdiction in equity; (2) that the decree is outside of the case made in the bill, which is for the enforcement of the corporate liability of the Virginia Oil Company; (3) that the evidence does not warrant the imputation of fraud to the defendants Tyler and the Virginia Oil Company; and (4) that the decree is devoid of support in the record.

(1) It is contended that the only ground on which the bill can be supported against Tyler is, that it contains averments to the effect that he is indebted to the corporation on account of his stock in it; that what is thus owed by him is a part of its assets; and that the plaintiff has an equity to compel payment of the amount thus due, and to subject it to her claim for damages against the corporation. It is contended that, stripped of those averments, the bill is nothing more than a declaration in an action on the case, at law, for the recovery of damages for a false representation; that, as the case stands in the record, with reference to Tyler, it is wholly destitute of equity, and therefore the court decreed on a case that was beyond its jurisdiction; that the only equity which the plaintiff pretended she had against Tyler was to compel him to pay in money for his stock in the company, it being averred that what had been claimed to be a payment for the stock was largely fraudulent and fictitious; that the master did not find that the stock issued to Tyler was not fully paid for, and, the plaintiff having excepted to the report because the master did not so find, the court confirmed his report in that respect; that, as the plaintiff took no appeal, the case was thus left destitute of equity against Tyler, and the bill should have been dismissed; and reference is made, under this head, to the cases of *Russell* v. *Clark's Executors*, 7 Cranch, 69, 89; *Thompson* v. *Railroad Companies*, 6 Wall. 137; *Insurance Co.* v. *Bailey*, 13 Wall. 616; *Parkersburg* v. *Brown*, 106 U. S. 487, 500; *Buzard* v. *Houston*, 119 U. S. 347, 352; *Kramer* v. *Cohn*, 119 U. S. 355, 357; and § 723 Rev. Stat. U. S.

The bill set out a case of fraud practised upon the plaintiff by Tyler, in that, in order to induce her to purchase the $10,000 of stock, he, as president of the company, sent to her the letter of April 10, 1884, upon the statements in which she relied and had a right to rely. It was alleged in the bill that the letter, both by its statements and its omissions, was false and deceitful, and operated as a fraud upon the plaintiff, and that, $10,000 having been obtained from her unlawfully, by the misrepresentations of the affairs of the company by Tyler, its president and duly authorized agent, and having gone into

its treasury and been expended by it, that sum was justly due her by Tyler and the company, with interest, and she had a right to require all the proper assets of the company to be gotten in and applied to the debts due to her and others; that the company was insolvent; and that a receiver ought to be appointed for it.

The bill also required from the defendants answers to the interrogatories which it contained. Tyler and Otley, in their answers to the interrogatories, referred to the books of the company as containing the facts which would give answers to those interrogatories; and Tyler, in his testimony, referred to the books as showing the facts in regard to the condition of the company on June 1, 1884. The information obtained from the answers to the interrogatories and from the proofs in the books showed the insolvent condition of the company on June 1, 1884, and that, as the master reported, it was at that date bankrupt. Tyler must be held to have had knowledge at that time of the condition of the company, as he was its president, and commenced keeping its books about March, 1883; and he is chargeable with knowledge of the facts, reported by the master, that of the $10,000 paid by the plaintiff he received personally the benefit of $6200. The recovery by the plaintiff thus depended largely on the information in the possession of the company and of Tyler, and which was sought for by the bill; and an application of the assets of the company, to replace such of the money paid by the plaintiff as had been used by it, was necessary before Tyler could be made responsible individually for what the assets of the company would not pay.

Thus there were in the case, as ingredients to support the jurisdiction of equity, discovery, account, fraud, misrepresentation and concealment. Story Eq. Jur. §§ 64 k, 67, 184, 191; *Jones v. Bolles*, 9 Wall. 364, 369.

Under § 723 of the Revised Statutes, the remedy at law, in order to exclude equity, must be as practical and as efficient to the ends of justice and its prompt administration, as the remedy in equity. *Boyce's Executors v. Grundy*, 3 Pet. 210, 215; *Insurance Co. v. Bailey*, 13 Wall. 616, 620.

In *Russell* v. *Clark's Executors*, 7 Cranch, 69, 89, the bill was one for discovery, and the answer disclosed nothing, the plaintiff supporting his case by testimony in his own possession. In the case now before us, discovery was only one of the grounds of jurisdiction, and the answers to the bill disclosed, through the books of the company, facts which the plaintiff sought to discover.

In *Parkersburg* v. *Brown*, 106 U. S. 487, 500, it was held that there was a plain, adequate and complete remedy at law for the relief granted by the decree. In the present case, discovery was prayed for and made, the affairs of an insolvent corporation were settled up, the subscription to stock made by the plaintiff was substantially cancelled, part of the proceeds of the assets of the company were applied to the repayment of the $10,000, and a decree for the balance was made against Tyler, the agent of the company, who had committed the fraud.

In *Buzard* v. *Houston*, 119 U. S. 347, the ruling was, that a court of equity would not sustain a bill in a case of fraud, to obtain only a decree for the payment of money by way of damages, when the like amount might be recovered in an action at law; and that, if a bill in equity showing ground for legal and not for equitable relief, prayed for a discovery as incidental only to the relief sought, and the answer disclosed nothing, but the plaintiff supported the claim by independent evidence, the bill ought to be dismissed, without prejudice to an action at law.

In *Kramer* v. *Cohn*, 119 U. S. 355, the ruling was, that a bill in equity by an assignee in bankruptcy against the bankrupt and another person, alleging that the bankrupt, with intent to defraud his creditors, concealed and sold his property and invested the proceeds in a business carried on by him in the name of the other defendant, should, on a failure to prove the latter allegation, be dismissed without prejudice to an action at law against the bankrupt.

The present case is not within the rulings in the cases thus referred to.

Moreover, the objection now made to the jurisdiction in

equity was not raised in the court below, by answer or other-wise. It is said in *Thompson* v. *Railroad Companies*, 6 Wall. 134, 137, that usually, where a case is not cognizable in a court of equity, the objection is interposed in the first instance, but that if a plain defect of jurisdiction appears at the hearing or on appeal, a court of equity will not make a decree. The present case, as before demonstrated, so far from showing a plain defect of equity jurisdiction, is a case for its exercise.

In recent cases in this court the subject of the raising for the first time in this court of the question of want of jurisdiction in equity has been considered. In *Reynes* v. *Dumont*, 130 U. S. 354, 395, it was said that the court, for its own protection, might prevent matters properly cognizable at law from being drawn into chancery at the pleasure of the parties interested, but that it by no means followed, where the subject-matter belonged to that class over which a court of equity had jurisdiction, and the objection that the complainant had an adequate remedy at law was not made until the hearing in the appellate tribunal, that the latter could exercise no discretion in the disposition of such objection; and reference was made to 1 Daniell's Chancery Practice, 555, 4th Am. ed.; *Wylie* v. *Coxe*, 15 How. 415, 420; *Oelrichs* v. *Spain*, 15 Wall. 211; and *Lewis* v. *Cocks*, 23 Wall. 466. To the same effect are *Kilbourn* v. *Sunderland*, 130 U. S. 505, 514; *Brown* v. *Lake Superior Iron Co.*, 134 U. S. 530, 535, 536; and *Allen* v. *Pullman's Palace Car Co.*, 139 U. S. 658, 662.

(2) As to the decree being outside the case made in the bill, we think the allegations of the bill as to the fraud are adequate, and that the statement of the decree that the company was represented to the plaintiff by Tyler, its president, to be in a flourishing condition, when in fact it was insolvent, is a sufficient support of the allegations of fraud made in the bill.

The averment of the bill that the $10,000 was justly due to the plaintiff by Tyler and the company, because that sum was unlawfully obtained from her by the misrepresentations of the affairs of the company by Tyler, who was its president and duly authorized agent, and because that sum went into the treasury of, and was expended by, the company, is a distinct

allegation that the $10,000 was justly due to her by Tyler. The further averment that the plaintiff had a right to require all the proper assets of the company to be gotten in and applied to the liquidation of the debts due to her and others, is merely an allegation that her first claim was to have the assets of the company applied to pay her, and that beyond that she had a claim against Tyler personally for the deficiency in such assets. There was a deficiency in the assets of the company, and the decree against Tyler was only for such deficiency.

The relief against Tyler was properly granted under the prayer of the bill for general relief. It was consonant with the facts set out in the bill as a ground of relief against Tyler personally, and it was relief agreeable to the case made by the bill. Story's Eq. Pl. § 40, etc.; *Tayloe* v. *Merchants' Fire Ins. Co.*, 9 How. 390, 406. The bill could not have been successfully demurred to for multifariousness.

As to the assignments of error (3) and (4) we are of opinion, without discussing the evidence in detail, that it sustains the report of the master and the decree. The master reported that on June 1, 1884, the company had lost its entire cash-paid stock and was largely in debt besides; that the formulas and recipes purchased for $8486.84 were then and ever since had been without value, or at least unsalable; and that, in a word, the company was bankrupt. These findings were not excepted to by Tyler or the company. A large part of the money which Tyler had loaned to the company was repaid to him out of the $10,000 paid by the plaintiff. Tyler's letter to the plaintiff of April 10, 1884, in saying, "The last dividend that was declared was a 7 per cent semi-annual. The fiscal year ends on the first of June," was calculated naturally to produce the impression upon the plaintiff's mind that the last dividend was declared on the 1st of June, 1883, whereas the last dividend was June 1, 1882. It must be inferred that, if the plaintiff had been informed that no dividend had been declared since June 1, 1882, she would not have subscribed for the stock. This suppression of a material fact, which Tyler was bound in good faith to disclose, was equivalent to a false representation. *Stewart* v. *Wyoming Ranche Co.*, 128 U. S.

383, 388.　The effect òf the fraud committed by Tyler enured directly to his personal advantage.　Not only was he, as a large stockholder and salaried officer, benefited by the plaintiff's payment into the treasury of the company of the $10,-000, but, as already shown, $6200 of that sum went directly to his benefit, and the remainder, he testifies, went to the purchase of material and ordinary expenses of the company. The latter amount enabled the company to continue paying to Tyler his salary for some time longer.

*Decree affirmed.*