BARRETT v. TWIN CITY POWER CO. et al.

(Circuit Court, D. South Carolina. November 22, 1902.)

1. EQUITY JURISDICTION—ADEQUATE REMEDY AT LAW—FEDERAL COURTS.

A remedy at law created by the statutes of a state cannot oust the jurisdiction of a federal court of equity.

2. SAME.

Complainant undertook to develop the water power of a river, and for that purpose secured options on adjoining lands, which were necessary to the project. Learning that other persons were also securing lands for the same purpose, negotiations were entered into, which resulted in his transferring his options to such persons, the purchasers to organize a corporation, and to deliver to complainant a certain amount in its bonds by a certain date in payment for such options, in default of which they were to be paid for in cash or returned. Differences arose between the parties respecting the payment, and the bonds were not delivered within the time specified. A demand for the return of the options, which were about to expire, was refused, and, the company having failed to complete the purchases thereunder, complainant filed his bill in equity, asking the appointment of a receiver to complete the purchases for the protection of his rights thereunder. *Held*, that such bill presented a case within the jurisdiction of a court of equity, and, having obtained jurisdiction for one purpose, the court would retain it to grant full relief.

3. CONTRACT—PERFORMANCE.

Complainant transferred property and rights to certain of the defendants under a contract that they should organize a corporation, and deliver a certain amount in its bonds to complainant in payment by a date named, otherwise to pay him the amount in cash on that date; time being made of the essence of the contract. The bonds were to be secured by mortgage on the corporation's property, and the issue was not to exceed 80 per cent. of the amount of its investment in such property. At the expiration of the time named, the corporation had been organized, but had not issued any bonds, nor executed any mortgage, and the amount it had invested up to that time was small. *Held*, that a delivery or tender to complainant of an accepted order on its treasurer for the delivery of the bonds when they should be issued was not a fulfillment of the contract, but that complainant was entitled to demand the cash payment.

4. SAME—ESTOPPEL TO DENY PERFORMANCE.

The failure of complainant to return the order, or to state his refusal to accept it, for some weeks after it was sent him by mail, did not work an estoppel against him, where he had distinctly refused to accept it when offered a few days previously, and notified defendants that he insisted on the bonds or the cash payment, and defendants had no reason to be misled as to his position.

5. SAME—WAIVER OF TIME FOR PERFORMANCE—AGENCY OF MORTGAGE TRUSTEE.

There having been no bonds nor mortgage in existence when the time for performance of the contract expired, the person who was afterward made trustee in the mortgage had no power, as agent or representative of complainant, to waive the limit of time in his behalf, by giving the order on the treasurer for delivery of the bonds when issued.

6. SAME—DEFENSES TO SUIT FOR ENFORCEMENT.

The assignees of certain options for the purchase of property, who retained the same, and transferred them to a corporation after they had made default in paying therefor and their return had been demanded by the assignor, cannot set up in defense to a suit for the enforcement of the contract that the price they agreed to pay was exorbitant, and the bargain unconscionable.

In Equity. On final hearing.

See 111 Fed. 45.

F. H. Miller, Wm. K. Miller, and D. S. Henderson, for complainant.

B. L. Abney and J. S. Muller, for defendants.

SIMONTON, Circuit Judge. Thomas Barrett, Jr., a citizen of the state of Georgia, resident in Augusta, desired to develop the water power of the Savannah river above the city of Augusta. To that end he secured the necessary capital, and proceeded to obtain options from owners of land on both sides of the river adjacent to the proposed site of his operations. Whilst he was engaged in securing these options, and after he had succeeded in obtaining some 15 of them, he found that there was another person engaged in the same purpose,—W. H. Chew, acting as trustee for C. E. Fisher, of New York. As these efforts were in conflict with each other, after some negotiation Chew determined to buy out Mr. Barrett, and finally a contract was entered into between them in the words and figures following; that is to say:

"Augusta, Ga., June 1, 1900.

"In consideration of five thousand dollars in cash, represented .by draft of W. H. Chew of G. E. Fisher, of 37 Wall street, New York, for $5,000.00, and the agreement of said trustee to have delivered to me fifteen thousand dollars of bonds as hereinafter stated,—total consideration, twenty thousand dollars,—I, Thomas Barrett, Jr., hereby agree to sell to said trustee all options owned by me and expiring May 1st, 1901, for the purchase of land fronting on the Savannah river, which stand in my name, and which are of record in Edgefield county, S. C., and Lincoln county, Ga., to which reference is made. This sale is upon the condition that said trustee and said G. E. Fisher and his associates shall proceed to organize an incorporation to develop a water power of not less than 15,000 horse power at or near Ring Jaw Shoals, on the Savannah river, within the space of eight (8) months from this date, and upon the completion of said incorporation to deliver me first mortgage bonds of the corporation for fifteen thousand dollars ($15,000), said corporation not to issue bonds in excess of 80 per cent. of the amount paid, laid out, and expended in the purchase of the various .tracts of land and the land covered by these options and in the development of· said water power, or that said trustee and said ·G. E. Fisher and his associates shall have the privilege of paying to me $15,000.00 in cash instead of bonds. It is distinctly understood that, if said draft for five thousand dollars is not paid on presentation, then this instrument is absolutely null and void, and, that if said money is paid, and the corporation is not organized, and the bonds hereinbefore specified issued and delivered to me by January 1st, 1901, or fifteen thousand dollars cash paid in lieu thereof,—time being of the essence of the contract,—then this sale shall be null and void, and the sum of five thousand dollars, paid to me at this time, shall not be accounted for by me, but shall be retained by me as the amount of liquidated damages agreed upon between the parties hereto for a violation of the said contract,' and all options to be returned to me the same as if this sale had not been made.    W. H. Chew, Trustee.
"Thomas Barrett, Jr."

It has been made to appear clearly that the date January 1, 1901, in this contract, is a clerical error, and should be February 1, 1901. Complying with this contract, Thomas Barrett, Jr., forthwith transferred and assigned all the options held by him, some 15 in all, to W. H. Chew, trustee. On August 7, 1900, a charter was issued by

the secretary of state of South Carolina to a corporation, the Twin City Power Company, which thenceforward took the place of Fisher, trustee, and Chew, his agent. At the time of the issuing of this charter the board of directors certified that 20 per cent. of the capital stock had been paid in. The liability of the stockholders was "only to the extent of the amount remaining due to the corporation on the stock owned by them." On December 8, 1900, D. M. McKaye, treasurer of the Twin City Power Company, wrote to Mr. Barrett, calling his attention to the error in the contract above referred to, and ends thus: "We shall now make more rapid progress, and will be ready to make delivery to you of the securities under the contract within the eight months designated, namely, January 31, 1901." On December 8, 1900, complainant wrote a letter to Wm. H. Chew, calling his attention to the terms of the contract and the stipulation therein. The bonds were to be delivered by January 1, 1901 (should be February 1), or $15,000 paid in cash in lieu thereof; that he will, of course, expect either bonds or cash. The receipt of this letter was acknowledged by Chew in his letter of December 14, 1900. He called attention to the clerical error in the date of the contract. On December 17, 1900, the complainant wrote to Chew, acknowledging receipt of this last letter, recognizing the clerical error in the contract, and stating that, if bonds were delivered by January 31, 1901, it would be all right; otherwise he would expect the $15,000 in cash at that time. On December 17, 1900, complainant replied to McKaye's letter of December 8th, recognizing the error in the contract as to January 1, 1901. On December 19, 1900, Chew, signing himself vice president and general manager, wrote to complainant, acknowledging his letter of December 17th, saying: "In reply would say that we will comply with our contract to the letter. Should we fail in getting our bonds ready, you will be paid as per agreement." In December, 1900, McKaye had an interview with complainant in Augusta, and suggested to him to take stock instead of bonds. This suggestion was not approved by complainant. After some discussion as to the value of the bonds, complainant stated to Mr. McKaye that he would expect the bonds if issued with the terms of the contract, otherwise he would expect the cash. On January 25, 1901, McKaye, as treasurer, wrote to complainant, saying that, owing to delay in securing important legislation and acquiring property, the company would be obliged to give an order for delivery of the bonds at the earliest day the bonds and mortgage were ready for delivery of the trustees; that he did not think the delay in the actual delivery of the bonds would make any difference to complainant if in place of them he held an order for their delivery at the first moment they are ready, which they expect will be within a very few weeks; ending with these words: "Kindly let us know if you have any suggestion to make regarding the wording of the delivery order." To this letter complainant replied on January 28, 1901, expressing great surprise at the proposal to give an order for bonds, instead of the bonds themselves; calling attention to the correspondence with Chew and himself; concluding: "I therefore beg to insist that you comply with the terms of the contract, and that, if the bonds are not ready for delivery on January 31, I shall expect

you to remit me fifteen thousand dollars in cash." On January 30, 1901, Chew wrote to complainant, acknowledging the receipt of this letter to McKaye, and inclosing an order signed by Chew, trustee, to McKaye, as treasurer of the Twin City Power Company, to deliver to Barrett $15,000 first mortgage 6 per cent. gold bonds as soon as said bonds are certified to by the trustees of the mortgage, and ready for delivery, claiming in this way the fulfillment of the contract of June 1, 1900. The acceptance of this order by McKaye is written on its face. This letter, sent by registered mail, reached Augusta and was receipted for February 1, 1901. At this time Barrett was sick at home, but could attend to his correspondence. He did not reply to it, but on March 23d thereafter he went to New York, and demanded from Chew, as an individual, as trustee for Fisher, and as vice president of the Twin City Power Company, the delivery of his options. He made the same demand on Fisher and on McKaye, treasurer. All these demands were refused. They admitted that the options had been transferred to the Twin City Power Company, that the expenditures then did not exceed between $40,000 and $50,000, that the stock of the company was $1,000,000, and that a mortgage was in the course of preparation. On that day formal assignment was made by Chew of all lands conveyed in South Carolina, or carried by the Barrett options, to the Twin City Power Company, and this was duly recorded in South Carolina. So the matter stood. The options of Barrett would expire on May 1, 1901. On March 30, 1901, he filed his bill in this court, amended April 16, 1901, against Chew, Fisher, the Twin City Power Company, and the parties giving the options, in which he sought to protect his rights under these options, demanding the fulfillment of the contract, praying that, inasmuch as the time was short, and the options in danger of loss, a receiver be appointed, authorized to make good the options or to protect them; at the same time offering to furnish all the money needed for this purpose, this advance to be secured to him. A temporary receiver was appointed. On hearing the rule to show cause issued on appointment of the temporary receiver, the following order was entered:

"It is therefore ordered that the defendant the Twin City Power Company secure to the complainant the performance of the agreement of the 1st of June, and to this end that it enter into bond with surety, to be approved by the judge of this court, in the penal sum of $15,000, with the condition that it preserve and keep in full force and effect each and every of the options delivered to Chew, trustee, by the complainant, under the agreement of June 1, 1900, and that it shall in every respect keep and perform the provisions of said agreement as construed by the order and decree of this court upon the final hearing of the case; that upon the execution and, approval of the said bond the temporary restraining order heretofore issued be rescinded, and the receivership be dissolved."

Thereafter bond was filed by the defendant in conformity to the provisions of this order, and the temporary receiver discharged. Defendant Twin City Power Company, Fisher, and McKaye filed their answer. The cause came to an issue, testimony was taken, and it is now before the court on pleadings and testimony for final decree. On July 23, 1901, the solicitors of defendant tendered in writing to

complainant, as in compliance of the order of Chew, trustee, on Mc-Kaye, treasurer, fifteen 6 per cent. first mortgage bonds of $1,000 each. This tender was declined on various grounds. The bonds were then deposited by the defendant with the clerk of this court.

The first question which arises, and the one demanding our first consideration, is as to the jurisdiction of this court. The defendant insists that the complainant has a plain, adequate, and complete remedy at law. When the bill was filed the complainant was in this position: He had been induced to abandon the enterprise in which he had entered of developing the water power of the Savannah river above Augusta, and had surrendered that to Chew and his associates, his competitors in that enterprise. He had transferred to them the options he had secured from landowners on each side of the river, which options were of essential necessity to the enterprise. When the time for the fulfillment of the contract between them arrived, a grave difference was found to exist. The defendant had agreed to deliver bonds of the amount of $15,000, secured by a first mortgage on the property, the entire issue being not greater than 80 per cent. of the value of the property, with the privilege of paying in lieu of such delivery $15,000 in cash. Efforts were made to adjust this difference until March 28, 1901, which failed. The options all expired on May 1st thereafter. Complainant desired the fulfillment of the contract according to its terms, or the return to him of his options. It was a matter of impossibility to obtain any adjudication upon the differences of the parties in this contract at any time before May 1st; and in the meantime, if these options were allowed to expire, the injury to complainant would be irreparable. It was of the last importance, therefore, to him, that the status quo be preserved; and this could not possibly be effected except by the use of the powers of a court of equity in the issue of an injunction and the appointment of a receiver, who could protect and conserve the interest of both parties. The statutory remedies provided by the Code of South Carolina could not oust the jurisdiction of a court of equity. The remedy at law which would prevent the exercise of equitable jurisdiction was one which was in existence when the judiciary act of 1789 was passed. McConihay v. Wright, 121 U. S. 206, 7 Sup. Ct. 940, 30 L. Ed. 932. Even if this statutory remedy could give relief, it does not oust the jurisdiction of the federal court. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. Besides this, the remedy at law to which the judiciary act refers must be as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity. Boyce v. Grundy, 3 Pet. 210, 7 L. Ed. 655; Insurance Co. v. Bailey, 13 Wall. 616, 20 L. Ed. 501; Tyler v. Savage, 143 U. S. 95, 12 Sup. Ct. 340, 36 L. Ed. 82; Gormley v. Clark, 134 U. S. 339, 10 Sup. Ct. 554, 33 L. Ed. 909; Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, 36 L. Ed. 82. The court of equity, having jurisdiction for one purpose, will retain the cause, and grant full relief. Clark v. Wooster, 119 U. S. 322, 7 Sup. Ct. 217, 30 L. Ed. 392; Ober v. Gallagher, 93 U. S. 199, 23 L. Ed. 829; Tayloe v. Insurance Co., 9 How. 390, 13 L. Ed. 187.

The next question in the case is, was there a breach of the contract

on the part of the defendant? The contract provided for the organ-ization of a corporation to develop the water power within eight months from the date of the contract (June 1, 1900), and upon the completion of said incorporation to deliver to Barrett first mort-gage bonds of the corporation for $15,000; and subsequently the date for such delivery is fixed at January (February) 1, 1901, time being of the essence of the contract. On February 1, 1901, the bonds were not ready for delivery. They in fact were not ready for delivery until July 23, 1901. But in lieu thereof Chew, trustee, sent to com-plainant an order on McKaye, treasurer of the corporation, to de-liver to complainant $15,000 in first mortgage gold bonds of the company as soon as the same were certified to by the trustee of the mortgage and ready for delivery. Was this a compliance with the terms of the contract? The bonds were not in existence. It was uncertain when they would be executed. The mortgage was not executed. The cost of the work was not ascertained. When Mc-Kaye accepted the order he had no means of immediate compliance. The delivery of the accepted order was, in effect, a change of the contract from a promise of delivery on a day certain to a promise of delivery on some unascertained—perhaps unascertainable—day in the future. If it were accepted as a release of the contract of June, 1900, it would be, in effect, the substitution of the contract of McKaye for that of Chew, trustee. Clearly, this was no compliance with the contract. It is a substitution of a promise to do a certain thing on a day certain by another promise to do it at some day in the fu-ture, as circumstances will allow. But it is said that the accepted or-der was sent to Barrett on February 1, 1901, was not returned, was not repudiated, and nothing was heard from him until some time in March following; and so complainant is estopped from denying the acceptance of the order. From the detailed statement of the correspondence on this subject in the former part of this opinion it appears that as late as December 19, 1900, Chew, as vice president and manager, assured complainant, "We will comply with our con-tract to the letter. Should we fail in getting our bonds ready, you will be paid as per agreement." This was in reply to a letter from complainant saying, if the bonds were delivered in accordance with the contract January 31, 1901, the matter would be all right; other-wise he would expect payment of $15,000 in cash. In the latter part of December Mr. McKaye had an interview with complainant; tried to get him to take stock for the bonds. This was refused, and McKaye was notified distinctly that the bonds would be, required. Up to that date no intimation was given on one side that the bonds could not be delivered, or that an order would be substituted for them; and certainly not any intimation whatever on the other side of a willingness to take an order in lieu of the bonds. On January 25, 1901, for the first time, it is proposed to give the order for the unexecuted bonds in lieu of the bonds themselves, and this is at once rejected by complainant in his reply dated January 28, 1901. On January 30, 1901, in the face of this rejection, the order is in-closed to complainant, and the letter inclosing it received on Febru-ary 1st. Barrett was not called upon to answer this at all. He

had never given any reason for an impression that he would accept such an order as the fulfillment of the contract. On the contrary, he had distinctly and repeatedly declared his determination to insist on the delivery of the bonds on the day fixed, or the payment of the money in lieu thereof. And when Chew wrote his letter of January 30, 1901, he knew that his order would not be accepted. How could he expect otherwise? The bonds which he had contracted to deliver were to be secured by a mortgage of all the property of the Twin City Power Company. The bonds secured by this mortgage were not to exceed 80 per cent. of the entire cost of the property and the development of the water power. This mortgage, at the date of this order, was not executed. Its terms were not known—could not be known—to complainant. The amount secured by the mortgage was unknown,—could not then be known. What man of ordinary prudence would accept an indefinite order for an unknown quantity as satisfaction and fulfillment of a contract definite in time, definite in amount, definite in all its terms, secured by a money equivalent?

It is said, however, that the complainant has estopped himself from denying that he accepted the order as a substitute for the bonds by the delay in repudiating it. The doctrine of estoppel is well stated in Chouteau v. Goddin, 39 Mo. 229, 90 Am. Dec. 462:

"When a party by his acts or words, causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous condition, he will be concluded from averring anything to the contrary against the party so altering his condition."

In Brant v. Iron Co., 93 U. S. 335, 23 L. Ed. 927, the supreme court says:

"For the application of the doctrine of equitable estoppel there must generally be some intended deception in the conduct or declaration of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud, by which another has been misled to his injury."

In all this class of cases, says Story, "the doctrine proceeds on the ground of fraud, or of gross negligence, which, in effect, implies fraud. And therefore, when the circumstances of the case repel any such inference, although there may be some degree of negligence, yet courts of equity will not grant relief." 1 Story, Eq. Jur. 391. To the same effect are the adjudged cases. If we examine the circumstances of this case, it must appear that no element of estoppel exists. The complainant had repeatedly insisted in writing on his right to the bonds or the money on the day fixed by the contract, of which it is distinctly stated time is of the essence. He had, in an interview with McKaye, promptly refused to take stock for his bonds, and in words insisted on the bonds. When McKaye afterward wrote to him, for the first time suggesting that an order for bonds, and not the bonds themselves, would be given him, he at once declined to accept it. And in reply to that letter came an order for the bonds, deliverable some time in the future. Could the delay in replying to this cause the defendants to believe that complainant had changed his mind, and had departed from his oft-expressed determination? Would any reasonable man have acted on such an impression, derived in this way? Do not all the circumstances repel such an infer-

ence? "The mere retention of a report by an agent of an unauthorized purchase on account of his principal, and the mere silence of the latter, are not, in law, an adoption of the act." Hansen v. Boyd, 161 U. S. 410, 16 Sup. Ct. 571, 40 L. Ed. 746. In what way was the defendant affected by the delay in returning the order for the bonds. In March, when the complainant visited New York to insist on his rights, not a bond had been issued; none had been prepared. The mortgage was not drafted nor executed. No progress whatever was made in the work. No money had been expended, except for the ordinary expenses of the company, and not more than $41,000; nearly all of which was for lands. The estimate put upon the enterprise by the Twin City Power Company called for an expenditure of one million to one and a quarter million of dollars. How could the dispute over the payment of $15,000 in money or in bonds affect such an enterprise? At all events, the position of complainant was known in March, and was emphasized by his bill filed March 30th. I see no ground of estoppel.

It is said, however, that, even if the order for bonds was not equivalent to the delivery of the bonds themselves, the limit of time in the contract was waived by the complainant through the trustee of the mortgage as his agent and representative. It is perfectly true that, when a mortgage has been executed to a trustee, and persons accept or purchase bonds secured by the mortgage, the trustee of the mortgage, for many purposes, is the representative and agent of the bondholders. But in the case at bar, when the time limit in the contract was about to expire, there was no mortgage, no trustee of the mortgage; indeed, no bonds. So there could not, by any possibility, be any connection between the complainant and any trustee. When the bonds were issued, some months afterward, this suit was in progress, and the complainant had disclaimed any intention to receive bonds.

The defendant has called the attention of the court to the difference between the cost to complainant of the options sold by him to the defendants and the amount he now demands for them. It is suggested that this is an unconscionable bargain, one which this court should not enforce. The complainant had determined to embark in the enterprise of utilizing the water power of Savannah river. To this end he began to obtain options from the riparian landowners on both sides of the river. Chew, trustee and agent, conceived the same enterprise for the defendants. Both the complainant and the defendants saw, or supposed that they saw, valuable results from this enterprise. Complainant was induced to forego all these results to himself, to abandon the enterprise, and to sell out to the defendants. He estimated his loss at $20,000. In this estimate Chew agreed, and promised to pay it to him. And on Chew's estimate Fisher and the Twin City Power Company must have agreed, for they adopted and assumed his contract; and all the options of Barrett, purchased at this price, were assigned to the Twin City Power Company, and the assignments recorded by that company, after full notice of complainant's demands. It is too late now to speak of this bargain as unconscionable.

I am of the opinion that under this contract the defendants were bound to make an actual delivery of bonds to the amount of $15,000, secured by a first mortgage on all the property of the Twin City Power Company; that they had an alternative of paying in cash $15,000, if said bonds were not delivered; that, failing to deliver the bonds, they were bound to pay the $15,000 in cash. 22 Am. & Eng. Enc. Law (2d Ed.) 543. Choice v. Moseley, 1 Bailey, 136, 19 Am. Dec. 661; Marlor v. Railroad Co. (C. C.) 21 Fed. 383; McGillin v. Bennett, 132 U. S. 445, 10 Sup. Ct. 122, 33 L. Ed. 422.

Let a decree be prepared in accordance with this opinion.