## MUNSEY TRUST CO. v. MINKER.

(Court of Appeals of District of Columbia. Submitted January 11, 1924. Decided March 3, 1924.)

No. 3993.

**Bills and notes ⚬⟿103(2)—Misrepresentations authorized cancellation of note and restoration of collateral security.**

That defendant represented to plaintiff that an employee whose books disclosed a shortage was honest, but was the victim of adverse circumstances, notwithstanding that defendant had in its possession an affidavit in which employee admitted that he appropriated the shortage, and defendant further represented that the shortage was less than it in fact was, *held* to authorize cancellation of a note given to cover what plaintiff was led to believe was the amount of the shortage and to require surrender of the collateral securing it.

Appeal from the Supreme Court of the District of Columbia.

Suit by Clarence W. Minker against the Munsey Trust Company. Decree for complainant, and defendant appeals. Affirmed.

Wilton J. Lambert and R. H. Yeatman, both of Washington, D. C., for appellant.

George E. Sullivan, of Washington, D. C., for appellee.

Before SMYTH, Chief Justice, VAN ORSDEL, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

SMYTH, Chief Justice. Minker instituted suit to rescind an agreement under which the Munsey Trust Company, appellant, obtained a promissory note and certain collateral, to cancel the note, and to require surrender of the collateral. A decree was entered for Minker, and the trust company brings the case here for our review.

One Claxton, treasurer of the trust company, was charged by it with responsibility for a large sum of money belonging to it which had been misapplied. After an audit of the books of the trust company had been made, disclosing the shortage, Claxton signed an affidavit in which he admitted that he had diverted certain funds of the trust company, "took" certain other funds belonging to it, and that none of the money thus diverted or taken had been paid back. Appreciating his situation, he went for assistance to Minker, to whom he declared that he was innocent of wrongdoing in connection with the matter, but that the trust company was making a demand on him for the money. Minker immediately telephoned to Mr. Lambert, attorney for the trust company, and had a short interview with him, at which a conference was arranged for the next day. Before entering that conference, Minker saw Henry, vice president of the trust company, and asked him if he felt that Claxton had gotten any of the money, to which Henry replied:

"Minker, I feel positive he did not get any of the money; but he has been a little indiscreet in some of his business methods."

Following this a conference was had, Minker, Claxton, Lambert, Henry, and one Sisk, representing a surety company interested in

⚬⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the defalcation, being present. Minker, according to his testimony, asked Lambert in the presence of the others whether he felt that Claxton got any money belonging to the bank, to which Lambert answered, "Positively I feel that he did not." Another conference was held a few days later, when Minker repeated his question as to whether they felt that Claxton had gotten any of the money of the bank. He followed it by saying, "I want you to be frank with me; I have thought over this matter squarely," and added that he wanted to help Claxton, but it was a great responsibility, and that he had just started out in business. According to Minker:

"They all answered to a man, 'We positively feel that he did not take any of this money.'"

Thereupon Minker signed a note for $10,500, and gave collateral to secure its payment. Up to this time he had no knowledge of the affidavit made by Claxton, admitting his responsibility and probable guilt; neither did he know that Claxton's indebtedness was nearly $15,000, instead of $10,500.

Claxton supported Minker's testimony with respect to what took place at the conferences. Sisk and Henry denied substantially that either Henry or Lambert made the statements attributed to them by Minker and Claxton, but they did not deny that the Claxton affidavit was not brought to the attention of Minker at the conferences. Lambert admits that whenever the question was asked him he said he had no evidence "that Mr. Claxton ever got any of that money," referring to a part of the shortage. He also admits that, while he had the Claxton affidavit, he did not tell Minker anything about it. About six weeks after Minker signed the note, he learned to his astonishment that Claxton was about to be indicted for embezzling the funds of the trust company. He also learned about that time of the affidavit, and that the note which he had given would cover only a part of Claxton's shortage, although he had been led to believe by representatives of the trust company, according to his testimony, that it covered the entire amount. He thereupon retained Mr. George E. Sullivan, of this bar, to advise him in the matter.

Minker and Sullivan called upon Henry for the purpose of securing a letter from him to the United States attorney, to the effect that Claxton had not taken any of the trust company's money. Henry refused to give the letter without Lambert's approval. Sullivan testifies that in the course of the conversation Minker said to Henry:

"Now, you remember, do you not, * * * that at the conference regarding this transaction originally I asked everybody present whether Mr. Claxton had gotten any of the moneys of the Munsey Trust Company, and you all said he had not?"

And Henry replied that he remembered it, and that "Mr. Minker was so assured." From Henry's office Minker and Sullivan went to Lambert's, and there Sullivan or Minker asked Lambert, so Sullivan testifies, whether Minker had not been told that Claxton had gotten none of the moneys of the Munsey Trust Company, to which Lambert said:

"That was—we had in mind in that conversation only the Jacobson drafts, the Hill defalcations."

Lambert was further asked by one of them whether or not, at the conference which was held at the time Minker gave his note, those present had not replied to a question put by Minker:

"That they were reasonably sure that Claxton had gotten none of the moneys, and Mr. Lambert answered in the affirmative that Mr. Minker had been so assured."

From the foregoing statement it is clear that there was a sharp conflict in the testimony. All the witnesses were more or less interested. Lambert admits that the Claxton affidavit was not disclosed to Minker, and that, when questioned, he had always said there was no evidence that Claxton had taken the money lost through the payment of what is spoken of in the record as the Jacobson drafts. The amount of that payment was over $9,500, or within $1,000 of the sum for which Minker gave his note. This admission tends a little to throw the balance in favor of Minker's theory. Besides, it appears, without contradiction, that the total amount of Claxton's indebtedness to the trust company, as shown by his affidavit and by the auditor's report, was nearly $15,000. The affidavit was kept from Minker, and he was led to believe that his note covered the total amount of Claxton's indebtedness.

The trial justice, as we have said, found in favor of Minker. He had an opportunity to observe and weigh things which had a bearing on the credibility of the witnesses, and which could not be conveyed to us on the printed page of the bill of exceptions. In view of the situation, we perceive no reason why we should overturn his finding.

The representation that Claxton was an honest man, when things tending to show the contrary were in the possession of the trust company's representatives, was a material one. A person might be perfectly willing to come to the rescue of an innocent man, who was the victim of adverse circumstances, yet would refuse to give any assistance to one probably guilty of dishonesty. Minker, according to his testimony, had just started in the meat business in Center Market. He said that by signing the note he assumed a great responsibility, but he wanted to help Claxton if he was innocent. The clear inference from this testimony is that he would not have signed the note but for the assurance of the trust company's representatives that Claxton had not misappropriated any of the money, and that $10,500 represented the entire amount of the indebtedness. By misrepresentation and suppression of facts the trust company's representatives produced a false impression upon the mind of Minker. This constituted sufficient ground for setting aside the transaction and granting the prayer of the bill. Stewart v. Wyoming Ranch Co., 128 U. S. 383, 388, 9 Sup. Ct. 101, 32 L. Ed. 439; Tyler v. Savage, 143 U. S. 79, 98, 12 Sup. Ct. 340, 36 L. Ed. 82. See, also, Browning v. Bank, 13 App. D. C. 1, 17.

The decree of the lower court is affirmed, with costs.

Affirmed.