COMMONWEALTH S. S. CO. v. AMERICAN SHIPBUILDING CO.
(three cases).

(District Court, N. D. Ohio, E. D. January 20, 1912.)

Nos. 8,210, 8,214, 8215.

1. COURTS (§ 312*)—JURISDICTION OF FEDERAL COURTS—SUITS BY "ASSIGNEE."
    A suit by a corporation, to rescind a contract for the building of a steamship by defendant, made between defendant and complainant's promoters, acting as trustees for complainant, and assumed by complainant on its organization, on the ground that the contract was fraudulent and procured by defendant by paying a secret commission to the promoters, is not one in which complainant sues as assignee within the meaning of Judiciary Act March 3, 1875, c. 137, § 1, 18 Stat. 470, as amended by Act March 3, 1887, c. 373, § 1, 24 Stat. 552, corrected by Act Aug. 13, 1888, c. 866, § 1, 25 Stat. 433 (U. S. Comp. St. 1901, p. 508), which provides that no federal court shall have cognizance of any suit to recover the contents of any chose in action "in favor of any assignee * * * unless such suit might have been prosecuted in such court to recover the said contents if no assignment or transfer had been made." In such case complainant is asserting no right derived from its promoters or which they could have asserted, and such statute has no application.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 865–875; Dec. Dig. § 312.*
    For other definitions, see Words and Phrases, vol. 1, pp. 562–564; vol. 8, p. 7584.]

2. CORPORATIONS (§ 448*)—CONTRACTS BEFORE ORGANIZATION—FRAUD OF PROMOTERS.
    A bill in equity filed by a steamship company alleged that it was organized by certain persons as promoters; that such persons had previously procured from defendant an option for a contract under which defendant was to build a steamship for a price stated therein; that the promoters represented that they had large experience in such matters and that the option was very favorable as to price, etc.; that on securing subscribers to the stock they entered into a contract with defendant for building the vessel, and complainant on its organization as-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sumed the contract, received and paid for the vessel, partly in cash and partly by the issuance of bonds, and also paid the promoters for their services in procuring the contract and superintending the building of the vessel in its behalf; that in fact the contract was fraudulent in that defendant, with knowledge of their purpose to organize a corporation to take over the contract, agreed to and did pay to the promoters a secret commission thereon. *Held*, that on the facts alleged the promoters in the transactions with defendant acted as trustees and agents for complainant and its stockholders, and the payment to them by defendant of a secret commission was in effect a bribery of its agent which vitiated the contract for fraud and entitled complainant to its rescission in equity, and on surrender of the vessel to recover the consideration paid therefor.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1709, 1789–1792; Dec. Dig. § 448.*]

**3.** CANCELLATION OF INSTRUMENTS (§ 15*)—REMEDY AT LAW—DAMAGES.

Where an agent has been bribed or paid a secret commission to enter into a contract, it is the absolute right of the principal on discovering the fraud to promptly rescind the contract, and he cannot be required to resort to an action at law for damages, especially where a bill for rescission requires an accounting which could not be had in an action at law.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 14, 21; Dec. Dig. § 15.*]

**4.** CORPORATIONS (§ 448*)—CONTRACT OF PROMOTER—SUIT FOR RESCISSION—DEFENSES.

It is not a defense to such a suit for rescission by a corporation that the agent through whose bribery the contract was procured by defendant is a stockholder of complainant.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1709, 1789–1792; Dec. Dig. § 448.*]

**5.** COURTS (§ 312*)—FEDERAL COURTS—ASSIGNEES—VALIDITY OF ASSIGNMENT—LAW GOVERNING.

The question whether a cause of action was assignable, so as to entitle the assignee to maintain a suit thereon in a federal court, is to be determined by the law of the state where all the transactions took place.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 865–875; Dec. Dig. § 312.*]

**6.** CORPORATIONS (§ 591*)—CONSOLIDATION—RIGHT OF ACTION—VALIDITY UNDER OHIO STATUTES.

Under the law of Ohio, by which all causes of action which are survivable are assignable, and Gen. Code Ohio, § 11,235, which provides that causes of action for deceit or fraud shall survive, the consolidation of two corporations, and the transfer by one to the other of all of its property and assets of every kind and description under sections 8710–8713 of said Code, vests the assignee corporation with the right to maintain a suit in equity for rescission of a contract made by the merged corporation on the ground that it was induced by the fraud of the defendant.

[Ed. Note.—For other cases, Corporations, Cent. Dig. §§ 2034, 2368–2372; Dec. Dig. § 591.*]

In Equity. Suits by the Commonwealth Steamship Company against the American Shipbuilding Company. On demurrers to bills. Overruled.

See, also, 197 Fed. 797.

---

A. B. Thompson, Charles P. Hine, and Clarence R. Bissell, all of Cleveland, Ohio, for complainant.

A. C. Dustin and Homer H. McKeehan, both of Cleveland, Ohio, for defendant.

DAY, District Judge. The questions under consideration arise upon transactions set forth and complained of in the bills filed in cases Nos. 8,210, 8,214. and 8,215.

The bills, are, in their effect, the same with this exception; that in cases Nos. 8,214 and 8,215 the complainant is suing as assignee ·or successor in interest of the original parties alleged to have been defrauded by these transactions.

· Bearing in mind this distinction as to these respective cases, the de-· murrers can all be considered together at this time.

It appears from an examination of the bills: That the Commonwealth Steamship Company is engaged in the business of owning and operating freight steamboats on the Great Lakes, and the defendant company is engaged in the business of constructing and repairing similar boats which operate on the Great Lakes. This Commonwealth Steamship. Company, the Milwaukee Steamship Company, and the Cuyahoga Steamship Company were promoted by W. A. Hawgood and A. H. Hawgood. They formed a plan of promoting these corporations for the purpose of contracting on their behalf with the defendant for the construction of boats or freight steamers, and of obtaining from the defendant large secret commissions for making such contracts and at such prices as should be fixed by the defendant, and also of obtaining from these steamship companies a large compensation for services pretended to be rendered on complainant's behalf in making said contracts and in obtaining first-class steamers at the prices stipulated in the several contracts, which prices the Hawgoods intended to represent were the lowest possible prices for which the steamers could be purchased, and for pretended services in superintending the construction of the steamers in these companies' behalf. That the Hawgoods, having formed this plan, procured a number of innocent persons to agree to become subscribers to the stock in the proposed corporations, and thereafter these Hawgoods, pursuant to this plan, obtained from the American Shipbuilding Company an option in the name of A. H. Hawgood for the building by the American Shipbuilding Company of a freight steamer, as alleged in case No. 8,210, for the ostensible sum of $385,000, which it appears differs in the other two cases; but so far as this consideration is concerned it is not important to refer to these separate prices for the other boats. That. pursuing this plan, the Hawgoods had at about the same time obtained from the American Shipbuilding Company, which at all times had notice 'and knowledge of the plan of the Hawgoods, and of the acts done thereunder, an agreement to pay to the Hawgoods the sum of at least $15,000 in the event that they should succeed in procuring the execution of a contract with the American Shipbuilding Company in accordance with the terms of the option; said sum to be paid as an alleged commission for obtaining the contract for the American

Shipbuilding Company. It might be said in passing that these commissions differed in the other two cases.

It is also charged in the several bills: That other sums were agreed to be paid and were paid to the Hawgoods by the American Shipbuilding Company in order to procure the contracts. The Hawgoods, having secured the options, made the fraudulent arrangements with the defendant, and then induced various innocent persons to associate themselves with the Hawgoods in the plan of forming the complainant corporation. That the Hawgoods represented to the persons that they had great experience in all matters relating to the building of freight steamers and that they were able to obtain from the defendant the construction of first-class steamers at the lowest possible prices, and that in securing the option they had used their best efforts on behalf of the persons associated with them in the formation of the complainant company to obtain contracts for first-class freight steamers at the lowest possible prices from the defendant, and they represented that they would cause the contracts and specifications to contain all the requirements necessary for obtaining first-class freight steamers and would superintend the construction thereof and thereby assure their associates and complainant that first-class freight steamers would be obtained.

These are the allegations of the bills. In cases Nos. 8,214 and 8,215, the complainant is the assignee of the companies formed by the Hawgoods.

Having progressed thus far, the Hawgoods concealed from those associated with them the fact that they were to obtain any money from the American Shipbuilding Company, and that those persons. relying upon these representations, and believing that the Hawgoods were not obtaining any money from the defendant, but were acting in good faith, subscribed for the capital stock of the complainant. That later, the Hawgoods, after they had obtained a sufficient number of subscribers to the capital stock, as trustees for the subscribers and for the corporations, contracted with the Shipbuilding Company for the construction of the ships referred to. These contracts were adopted by the steamship companies as soon as incorporated.

The American Shipbuilding Company paid the Hawgoods the commission agreed upon, and the Commonwealth Steamship Company and other corporations paid the Hawgoods for their alleged services in securing the option and contract of superintending the construction of the steamer. That the Commonwealth Steamship Company and the corporations mentioned in the other two bills, in assuming the contract, relied entirely upon the belief induced by the acts and representations of the Hawgoods and the American Shipbuilding Company. The consideration for the vessels was paid partly in cash and partly in bonds, secured by a mortgage on the vessels, a portion of which has been paid and a portion of which is outstanding. That the Shipbuilding Company, with full knowledge of the relation of the Hawgoods to the persons associated with them and the companies so organized, paid these secret commissions to the Hawgoods. That most of the persons, if not all of them, are now stockholders in the com-

plainant company. That the consideration for the vessels in each instance has been delivered and accepted by the defendant, and that most of the bonds have been negotiated by the defendant. That the Shipbuilding Company at all times knew the trust relationship of the Hawgoods to the steamship companies, and that these facts were not known to the complainant until September, 1911. That on the 18th day of September, 1911, the complainant notified the defendant that the Commonwealth Steamship Company rescinded the contracts on the ground of the fraudulent acts of the defendant and tendered and offered the vessel in each case to the defendant, and also offered to compensate the defendant for any amount that was justly due to the defendant for the intermediate use of the steamers and offered an accounting. It is further alleged that the complainant has no adequate or complete remedy at law, and prays that the contract be rescinded and canceled and that the defendant shall surrender the unpaid bonds or secure their payment by a deposit in court, that the amount of the purchase money may be paid to the complainant, together with such amounts as the complainant has paid on the principal and interest on the bonds, together with interest. And it is accordingly contended that the Commonwealth Steamship Company is entitled to rescind the contracts with the American Shipbuilding Company.

To these bills which have substantially the same allegations, with the addition of the allegation of assignment in cases Nos. 8,214 and 8,215, the defendant has filed demurrers; the following reasons being assigned as ground of demurrer:

(1) The court is without jurisdiction herein, in that the bill of complaint is filed on behalf of an assignee of a contract, and it does not appear from said bill that the assignors of said contract could have maintained an action in this court.

(2) That the bill on its face does not show that the complainant is entitled to the relief prayed for.

(3) Said complainant, if entitled to any relief whatever, by reason of the facts set forth in said bill, has an adequate remedy at law.

And an additional ground of demurrer in cases 8,214 and 8,215, which will be here designated as the fourth ground: (4) If the facts alleged in said bill of complaint are sufficient to give the Cuyahoga Steamship Company, the original purchaser of the steamer Sheldon Parks, a remedy for the wrongs complained of, in the nature of a rescission of said contract (which is denied), such remedy was personal to the Cuyahoga Steamship Company and did not pass to the complainant by the sale of all the assets and property of said Cuyahoga Steamship Company to the complainant herein.

[1] The first ground of the demurrer raises the question whether the court has jurisdiction herein, and counsel for the shipbuilding company contend that the bill of complaint is filed in behalf of an assignee of a contract, and that it does not appear from the bill that the assignors of the contract could have maintained an action in this court.

Now section 629 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 508) provides in substance that no Circuit or District Court shall "have cognizance of any suit * * * to recover

the contents of any   *   *   *   chose in action in favor of any assignee or of any subsequent holder   *   *   *   unless such suit might have been prosecuted in such court to recover the said *contents* if no assignment or transfer has been made."

Now the terms "the contents of any promissory note or other chose in action" have been construed to embrace the rights the instrument conferred which were capable of enforcement by suit. They were not happily chosen to convey this meaning, but they have received this construction. Shoecraft v. Bloxham, 124 U. S. 730, 735, 8 Sup. Ct. 686, 31 L. Ed. 574; Plant Investment Co. v. Keywest R. R., 152 U. S. 76, 14 Sup. Ct. 483, 38 L. Ed. 358.

Now does this bill endeavor to set forth a cause of action which seeks to enforce a right conferred upon the Hawgoods by a contract assigned by them to the complainant? From the allegations of the bills, whatever contracts the Hawgoods had with the defendant for the construction of steamers certainly gave the Hawgoods no right to rescind the contracts. The complainant's right to rescind the contract is not based on any contract rights transferred to it by the Hawgoods, but the bills in their entirety proceed upon the theory that the rights of action exist in the complainant by reason of the fraud of the Hawgoods and the defendant.

I cannot see that section 657, Rev. Stat. U. S. (U. S. Comp. St. 1901, p. 529), has any application to the bills in question.

The complainant makes no claim that it is the assignee of the Hawgoods. They allege that the Hawgoods were the trustees and merely held the legal title, and they rely on no cause of action which the Hawgoods had or might claim they had at any time. The complainant is not relying on the right of the Hawgoods, but upon the fraud of the Hawgoods and the defendant.

[2] Does the bill on its face show that the complainant is entitled to the relief prayed for?

Now it is alleged that the defendants executed and delivered an option, naming a factitious price, and that the defendant paid a secret commission to the Hawgoods, with knowledge of their trust relationship to the complainant; that the defendant did not disclose this payment at any time to the complainants. In plain words the American Shipbuilding Company paid a secret commission to the agent or representative of the complainant company. This commission was paid, this relationship was known, according to the allegations of the bill, at the time when the contracts for the construction of the boats were entered into.

We have here presented by the allegations of the bills a secret payment by one party to a contract to the agent of another contracting party, and the broad question is whether or not these allegations of the actions of the Hawgoods and of the actions of the American Shipbuilding Company in dealing with them entitled the complainant to the right to rescind these contracts in a court of equity.

The questions involved in the cases before us were quite similar to the questions considered by the Court of Appeals of this circuit in the case of Yeiser v. United States Board & Paper Co., 107 Fed.

340, 46 C. C. A. 567, 52 L. R. A. 724. The court at that time· was composed of Judges Lurton and Day, now on the Supreme Bench of the United States, and Judge Severens. Judge Severens in delivering the opinion of the court said in part:

"It is a well-settled principle of equity that those who participate in bringing about the organization of an incorporated company, and in getting it in condition for transacting the business for which it is organized, assume the obligations of a trust towards the company and those who shall be invited to come into the enterprise as stockholders and share in its fortunes. The latter have the right to rely on the good faith and fair dealing of those who have promoted the company; and to assume that they have not perverted the organization by secret means to the accomplishment of selfish purposes, and the destruction of the equality of right which, in the absence of some known modification, all the shareholders are entitled to enjoy. Indeed, some of the decided cases hold a wider doctrine, and declare that, whether the promoter becomes a stockholder himself or not, he owes a like duty to those who become such, and cannot, by covert manipulation of the company while it is under his control, and without the faculty of acting for itself, take a personal profit from his dealings with it. The recognition of a fiduciary relation in such circumstances is merely the application of a familiar principle of equity, which fastens a trust upon one who has such power over another and his affairs as to give the former an opportunity to make personal gains in his dealings with them.

"The reasons for the enforcement of that principle in such cases as this are obvious. Without it there is nothing to hinder the concoction of schemes which the reports of decisions show are becoming quite too frequent·in recent years, during which corporations have so greatly multiplied, whereby one may take an option or conditional contract for the purchase of property, and then turn it over, at a profit to himself, to a corporation to be organized, and be under his own control for a sufficient time to enable him to realize the fruits of his enterprise. Unless the promoter of the company is restrained by. the obligations of a duty which prevents him from bringing the consequences which are liable to result to others who may be led into danger, he may practice such schemes with impunity. Of course, these observations do not apply to a case where the corporation, having knowledge of the facts and freedom of action, consents to a contract proposed by another, even though he may be a stockholder or a director. The corporation could not in such case complain, nor could a stockholder, if there had been no actually fraudulent purpose towards him.

"When, on August 3, 1906, Browne and Stuart made their proposition to sell the mill to their company, and they and their co-operating associates, acting as the board of directors, accepted it for the company, the company was completely in fetters. While it was made to be a purchaser, it was dominated by the seller. It had no organ for seeing, hearing, or even knowing what was going on. Its whole constituency was engaged in bringing about the sale for the sellers. We have, on several occasions, held that where one who assumes to act as the agent of another, in· a given transaction is really acting as the agent of a third person, or in behalf of some scheme of his own, his apparent principal, having no knowledge of such alien purpose, is not bound by such pretended agent's acts, nor by any notice or knowledge of facts which such agent had at the time the transaction was going forward."

Meachem, in his Law of Agency (section 798):

"As has been seen, an agent who is relied upon to exercise, in behalf of his principal, his· skill, knowledge, or influence, will not be permitted, without his principal's full knowledge and. consent, to undertake ·to represent the other party also in the same transaction. Such conduct is a fraud upon his principal, and not only will the agent not be entitled to compensation for services so rendered, but the contract or· dealings made or had by the agent, while so acting also for the other party without the knowledge or consent

of the principal, are not binding upon the latter, and if they still remain executory, he may repudiate them on that ground, or if they have been executed in whole or in part, he may, by acting promptly and before the rights of innocent parties have intervened, restore the consideration received, rescind the contract, and recover back the property or rights with which he has parted under it.

"It makes no difference that the principal was not in fact injured, or that the agent intended no wrong, or that the other party acted in good faith; the double agency is a fraud upon the principal, and he is not bound." Reinhard on Agency, § 392, p. 394; Pomeroy's Equity Jurisprudence, § 959, note 1; Smith on Fraud, § 114; Ewell, Evans on Agency, p. 570; Alger v. Anderson (C. C.) 78 Fed. 729.

The complainant alleges facts in its bills of complaint showing that the Hawgoods while acting in a trust capacity received a bribe or commission.

I think it is well established that, when an agent has been bribed to betray his principal, that fact is sufficient to entitle the principal to repudiate the transaction.

Judge Clark, in delivering the opinion in the case of Alger v. Anderson (C. C.) 78 Fed. 729, says:

"How far a fact of this kind may have influenced the agent is in its nature an intangible mental condition very largely, and could only be rationally judged of by what follows. It would probably never be in the power of the principal complaining of the transaction to affirmatively show what was the secret operation of such an influence on the mind of a treacherous representative. It is well settled, consequently, that the fact of the agent having been bribed or tempted to betray his principal is sufficient to entitle the principal to repudiate the transaction, and it is not necessary as a basis for relief for such principal to show the actual effect of the bribe or gift upon the agent. The ground on which the rule rests is much deeper and broader than a mere question of evidence, and takes into full account human nature. The agent is not allowed, by gift, commission, or other form of compensation or consideration, to assume an attitude in conflict with the very best interests of his principal. It is a relation which, on grounds of public policy, demands the utmost loyalty to the principal at all times." City of Findlay v. Pertz, 66 Fed. 427, 13 C. C. A. 559, 29 L. R. A. 188; Zinc Carbonate Co. v. First National Bank of Shullsburg, 103 Wis. 125, 79 N. W. 229, 74 Am. St. Rep. 845.

Defendant also alleges that the bills on their face do not show that the complainant is entitled to the relief prayed for, and contends that it is plainly apparent on the face of the bills that, had the misrepresentation and fraud complained of not occurred, the conduct of the parties would have been the same; that the fraud complained of did not in any manner affect the substance of the contract and the thing desired and contracted for by the complainant was in all respects according to the terms of the contract; that a redelivery of the boats would not place the defendant in statu quo because at the time of making the contracts the boats had not been constructed; and that in order to place the defendant in statu quo there would have to be a return of the material and money paid out for labor; and, further, that the surrender of the consideration received by the defendants would leave the defendant poorer than it was before the contract was negotiated, to the extent of the money received and held by the Hawgoods.

In other words, the defendants contend that although on the face of

the bills there are allegations that a secret bribe or commission has been paid to the Hawgoods while the Hawgoods were acting in the capacity of trustees or promoters, and that fact having been discovered, nevertheless there is no equity in the bills, and that a rescission of the contracts would injure the American Shipbuilding Company both in reference to the restoration of the boats and the loss of the amounts paid to the Hawgoods.

Counsel for the defendants rely largely upon the case of Veazie v. Williams, 8 How. 134, 12 L. Ed. 1018. In this case the owners had instructed the auctioneer to take $14,500 for a certain property, and the real bidding stopped at $20,000, and the auctioneer, without the consent or knowledge of the owner, continued to take fictitious bids until he ran the price up to $40,000. The purchaser, under these conditions, filed a bill asking the rescission of the sale and a return of the purchase money paid and notes still held by the respondents as part of the purchase price.

It appears, from a careful examination of this case, that up to a certain stage in the auction sale there was no fraud present; that up to the extent of $20,000 the bids were fair; that from and above this amount the bids were induced by the fraud of the auctioneer. So that it can be seen quite readily that the line of demarcation between honesty, fair dealing, and fraud is clearly and distinctly noticeable. A number of observations made by the learned justice in rendering the opinion of the court are, to my mind, important to be here noticed. Justice Woodbury says, at page 151 of 8 How., 12 L. Ed. 1018, speaking of this action of the auctioneer:

"Had it been otherwise, it would be very questionable whether, in point of law and equity, an auctioneer can be allowed to bid off for himself the very property he is selling. It has been laid down that he cannot. Hughes' Case, 6 Ves. 617; Oliver et al. v. Court et al., 8 Price, 126; 9 Ves. 234; 8 Ves. 337; Long on Sales, 228; Babbington on Auctions, 164. The principles against it are stronger, if possible, and certainly were enforced earlier in courts of equity than in law. An opposite course would give to an auctioneer many undue advantages. It would tend, also, to weaken his fidelity in the execution of his duties, for the owner. He would be allowed to act in double and inconsistent capacities, as agent for the seller and as buyer also; and the precedents are numerous holding such sales voidable, if not void, and at all events unlawful, as opposed to the soundest public policy.

"Nor does it lessen the injury or the fraud if the by-bidding be by the auctioneer himself. He, being agent of the owner, is equally with him forbidden by sound principles to conduct clandestinely and falsely on this subject. Cowp. 397. All should be fair, above board.

"The sale thus made here was adopted and carried into effect by the respondents; and hence, on account of the fraud involved in it, they should either restore the consideration, and take back the mills, or indemnify the purchaser to the extent of his sufferings.

"Some miscellaneous objections to these results are yet to be considered. It is said to be justly deemed an extraordinary power in a court of chancery to rescind contracts at all, instead of leaving parties to a suit at law for their damages. Sugden on Vendors, 392; [Jackson v. Ashton] 11 Pet. 248 [9 L. Ed. 698]. And that a fraud or mistake must be very manifest to justify it. 10 Price, 117; 13 Price, 349; [Lee v. Munroe & Thornton] 7 Cranch, 368 [3 L. Ed. 373]; [Lyman v. United Ins. Co.] 2 Johns. Ch. (N. Y.) 633; 12 Ves. 477. And that the burden of proof to show these grounds for a rescission rests on the plaintiff, and not on the defendant. Grant this. Yet all requirements appear fulfilled here. On satisfactory proof, also, executed,

as well as executory, contracts may in such cases be set aside. One case reported of its being done after 20 years. 8 Price, 125. And a defendant is likely in most cases to suffer no more by a rescission in chancery, than by damages adequate to the loss or injury.

"There is next the objection, that too long a time had elapsed here before seeking redress. More force would attach to this if Veazie had discovered the imposition sooner. The sale happened January 1, 1836; the discovery of the fraud was after January 1, 1840, and this bill was filed July 23, 1841, after demanding redress of the respondents in January, 1841.

"Having effected his object in the purchase—to obtain the property rather than let his rival get it, who, doubtless, he supposed, was bidding against him—and being a man of ample means, Veazie submitted, as feeling bound, to the excess of price. Nor did he suspect any imposition till informed of it within a few years, and then he seasonably applied for relief, and should not be barred from obtaining it by any lapse of time while the fraud or mistake as to the bids not being real remained undiscovered.

"All that remains is to decide upon the most equitable course to carry these views into effect, consistent with sound principles. One mode is to set aside unconditionally the whole sale, for the fraud practiced in it, and have the mills conveyed by Veazie, and the money, notes, and mortgage returned by the respondents. Another mode is to treat as unjust only so much of the proceedings as was fraudulent; that is, the excess of price over $20,000 obtained by by-bidding, and to cause that excess only to be refunded.

"To restore the excess of consideration, or to restore all and have back the mills, has in other respects much the same effect. The plaintiff in either way will obtain nothing which did not belong to him, nor the respondents lose anything which was theirs before the falsehood or mistake. It is at the same time gratifying to find that, by either of these courses, no incidental loss or inconvenience will fall on the respondents, except what has been occasioned by the misbehavior of their own agent, and the fruits of which they accepted, and which they cannot in foro conscientiæ retain against those injured by that misbehavior.

"But the course we propose, to have the sale stand so far as not fraudulent, and to make the defendants restore only what was obtained by the puffing and fraud, is not giving damages either eo nomine or in substance. It requires to be surrendered merely the money and interest in it, and the notes and mortgage unpaid, which were obtained by the deception of by-bidding. This, among other things, is prayed for in the bill. This course will only carry out the established rule on the subject, laid down in elementary treatises, that the injured party is placed in the same situation, and the other party is compelled to do the same acts, as if all had been transacted with the utmost good faith. 1 Story, Eq. Jur. § 420; 1 Madd. Ch. Pr. 209; Fonbl. Eq. Book 1, cc. 3 and 4, notes.

"It is suggested, however, secondly, that this course does not set aside the whole sale, or whole contract, which ought to be done, if intermeddled with at all. It is true that generally, a part of a deed, or contract, or sale, cannot be avoided without avoiding the whole. 2 Ves. 408; 1 Madd. Ch. 262. Though at times there may be a division or break in them where fraud begins and good faith ends, and where beyond that line only it would seem just to annul them. [Jopling v. Dooley] 1 Yerg. (Tenn.) 289 [24 Am. Dec. 450.]

" 'And it will not grant relief even in fraud, unless the party wishing it will do complete justice.' Payne v. Dudley, 1 Wash. (Va.) 196; [Boyd v. Dunlap] 1 Johns. Ch. (N. Y.) 478; Scott v. Nesbit, 2 Cox, 183. Here, then, in the decree, we can set aside the whole sale and contract; but, instead of doing it unconditionally, the plaintiff should be required first to do equity, and to allow any countervailing equities on the part of the respondents, which are, to let the sale itself stand at what was fairly bid for the property, and require only the residue of the consideration, being entirely fraudulent, to be restored. 1 Story, Eq. Jur. §§ 344, 599, and cases there cited; McDonald v. Neilson, 2 Cow. (N. Y.) 139, 192 [14 Am. Dec. 431]."

I have quoted from this case at some length, because it appears to be the main case upon which counsel for the defendant relies. It

is very plain to me that the relief granted in this case was granted because it was possible to draw a line between fair dealing and fraud. Had it been otherwise, I think it is quite apparent that the contract would have been rescinded. The relief was granted not on the ground that the complainant was entitled to recover nothing except the excess of the purchase price produced by the fraud, but the relief was granted because of the easily distinguishable line marking the commencement of the fraud, and the ability of the court to treat the fraud by itself and render relief accordingly.

Now the bills before me for consideration allege sufficient facts to properly indicate a continuing fraud from the inception to the end of the dealings between the stockholders and subscribers on the one side and the American Shipbuilding Company and the Hawgoods on the other side; the Hawgoods were trustees as to these stock-holders and were promoters of these various steamship companies.

From the very commenceemnt of these various transactions it appears from the bills that the American Shipbuilding Company and the Hawgoods had in contemplation the making of these contracts and the giving of these secret commissions, or, stating the transactions more plainly, the American Shipbuilding Company proposed to corrupt the agents of these various steamship companies by the payment of a sum of money in the form of a bribe.

These transactions were at no time disclosed to the subscribers or stockholders nor to the corporations, nor were they discovered until September, 1911, when actions for rescission were promptly brought. The Hawgoods, from the relationship which they assumed with these various corporations to the stockholders therein, which was that of promotors or trustees, owed to these parties whom they represented the obligation of fair and open dealing, and this obligation of an agent or trustee has been frequently considered by the courts of Ohio and by the federal courts of this jurisdiction.

It is apparent from the bill that the Hawgoods were trustees to use their knowledge, their skill, and their good faith in their dealings for the persons whom they represented. Having been paid this sum of money secretly, can it be said that the parties relying upon their integrity had the full value of their services? In the case of Yeoman v. Lasley, 40 Ohio St. 190, 200, the Supreme Court of the state of Ohio says:

"A vendee cannot be his own vendor. So vital is this principle that the same person cannot be in one transaction the agent of both vendor and ven-dee unless both know the fact and consent thereto. If a vendor secretly bribe the agent of the vendee, and induce him to deceive his principal in a matter material to the sale, the vendee's right, on discovery of the fraud, to a rescission, is undoubted."

And again in the case of Rolling Stock Co. v. Railroad, 34 Ohio St., at page 460, 32 Am. Rep. 380, the Supreme Court of Ohio said:

"The rule which prevents the agent or trustee from acting for himself in a matter where his interest would conflict with his duty also prevents him from acting for another whose interest is adverse to that of the principal; and, in all cases where, without the assent of the principal, the agent has assumed to act in such double capacity, the principal may avoid the trans--

action, at his election.   No question of its fairness or unfairness can be raised.   The law holds it constructively fraudulent and voidable at the election of the principal."

It is not necessary to go into an extended discussion of the authorities.   It seems plain that when one party is endeavoring to warp the judgment and integrity of the agent of another, and endeavoring to induce that party to cheat his principal, all of the dictates of equity and justice make it the plain duty of a court of equity to set aside the entire transaction.

Such action on the part of a court has been suggested by counsel for the defendant in their able brief, as an altruistic enthusiasm for purity and righteousness in commercial transactions.   It appears to me that it is only the exercise by the court of a function which impresses upon all parties that commercial transactions, be they large or small, must conform with the fixed standards of honesty.   It would indeed be a travesty upon justice, if a court of equity, having placed before it all of the elements which constitute fraud and bribery, would refuse to render relief and say to the parties that an action for damages to recover the amount of the bribe was the proper remedy. If such were the rule of conduct of the courts, dishonest parties might bribe agents at will, and, if they were discovered in their bribery, respond to damages to the extent of the bribe, and, if not discovered, enjoy the full amount and extent of their illegal action.   The courts cannot recognize such a doctrine, and will not stop to inquire whether the contract was fair or otherwise, but will set aside the entire transaction as fraudulent and inequitable.   With commercial advancement and the evolution of modern business fraud has become too prevalent and too readily reconciled as an incident to financial achievement. Fraud should be prevented by being made as far as possible impossible of perpetration, and the party who enters into a fraudulent transaction should do so at his peril.   It is no duty of a court to weigh the equities of joint tort-feasors, or of bribe givers and bribe takers.   A court could have little respect for itself if it endeavored to adjust the rights existing between the conspiring parties who endeavored to perpetrate a fraud.

Defendant's counsel urge that the defendant cannot be placed in statu quo by a surrender of the boats in question.   If it cannot be restored to the position it occupied before these contracts in question were entered into, it is because of its own fault.   If the property has fallen in value, it was partly owing to the fault of the defendant, and its co-conspirators, the Hawgoods.

From the allegations of the bills fraud entered into the entire transactions from their inception.   The contracts were tainted with it; and, such being the situation, it is no objection to a restoration of these boats that the property has fallen in value.   Pomeroy's Equity Jurisprudence, § 688; Neblett v. McFarland, 92 U. S. 104, 23 L. Ed. 471; Veazie v. Williams, 8 How. 158, 12 L. Ed. 1018.

[3]   The defendant contends that the only injury suffered by the complainant is the loss of money received by the Hawgoods, and upon

this statement bases its contention that the complainant has an adequate remedy at law.

In the United States courts it is well established, both by the decisions and statute, that suits in equity shall not be sustained in the federal courts in any case where there is a plain, adequate, and complete remedy at law. I think it is equally well established that where such a remedy exists, and the objection is seasonably made that there is in existence an adequate remedy at law, it is the positive duty of a federal court to give effect to such objection. It is well established, if the bill itself shows a ground for legal relief and prays, incidentally, for equitable relief, that notwithstanding such prayer, such a case should be tried in a law court, and that the remedy at law should be pursued, if it exists, no matter whether it is difficult of execution.

Now do the bills give rise only to an action for damages for money had and received by the Hawgoods? If so, it might well be urged that the complainant has an adequate and complete remedy at law. This objection is promptly urged by the defendant.

But the bills disclose that the contracts were entered into on reliance upon the judgment and interest of the Hawgoods. Then it cannot be said that, had the original subscribers and stockholders of the corporations known that the Hawgoods were getting in a secret manner sums of money of from $15,000 to $25,000, they would have acted as they did when entering into these contracts. Large investments were involved, and from the allegations absolute reliance was placed upon the Hawgoods in the making of these investments. It is an absurdity to presume that any one would enter into a $400,000 business transaction, knowing that they were represented by an agent who had been paid $25,000 by the other party to the transaction. As I have indicated, where an agent has been bribed or has been paid a secret commission, it is the absolute right of a party to such a contract, upon discovering this fraud, to promptly rescind it. Rolling Stock Co. v. Railroad, 34 Ohio St. 460, 32 Am. Rep. 380; Mecham on Agency, § 798; Alger v. Anderson (C. C.) 78 Fed. 729; Cortes Co. v. Thannhauser (C. C.) 45 Fed. 730; Veazie v. Williams, 8 How. 134, 12 L. Ed. 1018.

In Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, 36 L. Ed. 82, the court said in part:

"Under section 723 of the Revised Statutes [U. S. Comp. St. 1901, p. 583], the remedy at law, in order to exclude equity, must be as practical and as efficient to the hands of justice and its prompt administration, as the remedy in equity."

The bill asks that the defendant be required to account to the complainant for bonds which are disposed of and secure the application of such payment to the satisfaction of such disposed of bonds as have not been paid. This could not be done in an action at law, and it would require the exercise of equity jurisdiction to grant this necessary relief.

The bills affirmatively show grounds of equitable jurisdiction. The bribery of the agent, the obtaining of the bonds, the trust relationships existing, all are grounds for relief in equity, and it is difficult to

see how in any manner of action at law the complainant could be given a full, adequate, and complete remedy.

It was said by the Supreme Court in the case of Angle v. C. & St. P. Ry., 151 U. S. 27, 14 Sup. Ct. 250, 38 L. Ed. 55:

"The forms and varieties of these trusts, which are termed ex maleficio or ex delicto, are practically without limit. The principle is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrongdoer."

In these cases the complainants have elected to bring equitable actions to rescind, and, under the authorities I have heretofore referred to, I am of the opinion that this suit was properly brought in the equity court.

The Hawgoods occupied a trust relationship. They accepted a secret commission. Had this fraud been known, the parties would never have entered into the contracts. They never had the unbiased judgment of the Hawgoods, although it might well be said that the Hawgoods were equally to blame with the Shipbuilding Company, yet nevertheless it is not the function of this court to draw such distinctions. The recovery of the amount of the commission is not a full and complete recovery. The whole transaction being fraudulent, an action to rescind in equity is the proper one. In no other way is adequate recourse given to complainants to right the wrong suffered. If the defendant is injured by such a course of proceeding, it was an injury caused to an appreciable extent by its own dereliction. The fraud cannot be separated or divided from the transaction, as was done in the case of Veazie v. Williams in 8 How. and 12 L. Ed. The complainant on the face of its bills has sustained a serious injury. It seeks to remedy this injury by electing to rescind these contracts, and such action is, I think, justified.

[4] It is further urged that the bills lack equity by reason of the fact that the Hawgoods are shown to be stockholders in the original companies, and that they are now stockholders in the complainant company. I have before referred to this feature of the case, and can see no merit in this contention.

It has never been the law that courts will endeavor to adjust equities between wrongdoers, nor will the courts endeavor to disturb the fraudulent liabilities of co-conspirators. The bills by their allegations show the bribery of an agent. This, of itself, establishes a fraud and gives the complainant a right to proceed in equity for a rescission of the contracts, because no complete and adequate remedy can be administered in a court of law. The facts, as pleaded, do not constitute a mere loss of money. They rather involve the entire transactions, fraudulent from their inception, and induced from their inception by a bribed agent. The complainant did not get what it contracted for. The contracts would not have been made had they known of all of the circumstances. All of the necessary parties to a rescission are before the court, and an action at law is not only unnecessary, but inadequate. A realization of wrongdoing at the initial proceeding of these transactions could have saved the defendant from any apparent loss at this time. The matter is only before the court

now on demurrer; the facts must be taken as alleged. In my opinion, the bills in each instance are not subject to demurrer on the jurisdictional question, nor on the grounds that the bills lack equity, nor on the ground that there is an adequate remedy at law.

There is, however, one more question for consideration in cases Nos. 8,214 and 8,215, and that is: Were the rights of the steamship companies originally formed, which are now relied upon by complainant, of a nature to be assigned? In case No. 8,215, the Milwaukee Steamship Company was the company originally formed, and in No. 8,214, the company originally formed was the Cuyahoga Steamship Company, and it remains to be determined whether the remedy of rescission was personal to these companies. If it was, it did not pass to the complainant by the transfer of all the assets and property of these two companies.

The allegations of the bill in case No. 8,214, and the similar allegations in case No. 8,215, with the exception of the name of the Steamship Company, are as follows:

"Prior to February, 1911, the complainant company and the Cuyahoga Steamship Company were each the owner of one large freight vessel operating on the Great Lakes. For the mutual advantage of the stockholders of said companies, it was mutually agreed that a merger of the properties and interest of all of said stockholders should be effected. This was accomplished by the Cuyahoga Steamship Company assigning and transferring all of its assets, of every kind and description, to the complainant company, which also assumed and agreed to pay all of the obligations of the Cuyahoga Steamship Company, including about * * * of first mortgage bonds on said steamer given to the defendant company in part payment of said vessel.

"The complainant company thereupon issued shares of its capital stock to each of the stockholders of the Cuyahoga Steamship Company, who then became and are now stockholders in complainant company.

"The transfer of the assets of the Cuyahoga Steamship Company to complainant included the vessel owned by it, and which had previously been constructed for it by the defendant company, the contract under which said vessel was constructed and all choses and rights in action, either at law or in equity, including the right of action herein sued upon in so far as such right of action was assignable.

"The fraudulent transactions set forth in the complaint were not discovered until after the dissolution of the Cuyahoga Steamship Company, and hence were never known to that company."

[5] This question of assignability has been most fully covered by counsel for complainant and defendant in their briefs; but, inasmuch as these transactions arose and took place in the state of Ohio, it is only necessary to determine the law of Ohio on the question raised by this branch of the demurrer. Accordingly, the question of whether the assignment conferred upon the complainant company the right of action it asserts must be decided according to the law of Ohio. Jos. Dixon Crucible Co. v. Paul, 167 Fed. 784, 93 C. C. A. 204; Davis v. Mills (C. C.) 99 Fed. 39; Union Trust Co. v. Bulkeley, 150 Fed. 511, 80 C. C. A. 328. This last case was decided by the Circuit Court of Appeals of this jurisdiction.

[6] From the briefs, and argument, there appears to be no dispute that the transactions which took place between the Milwaukee Steamship Company and the Cuyahoga Steamship Company and the com-

plainant herein were effected under the provisions of sections 8710 to 8713, inclusive, of the Ohio General Code. But I do not consider this of any importance further than that section 8712 provides for the purchasing or acquiring company taking over all of the property and assets of the other corporation involved.

The bill avers that the steamship companies, which were originally formed, assigned and transferred to the complainant herein all of their assets of every kind and description, and that complainant assumed and agreed to pay all of the obligations of the companies originally formed.

The Ohio law recognizes that a chose in action which is transmissible to an executor or administrator under the law of Ohio is assignable in equity. Grant v. Ludlow, 8 Ohio St. 1. And that survivability and assignability of things in action are convertible terms. The Village of Cardington v. Fredericks, 46 Ohio St. 442, 448, 21 N. E. 766; Cincinnati v. Hafer, 49 Ohio St. 60, 66, 30 N. E. 197.

The Ohio law being that all causes of action which are survivable are assignable, it is important to determine whether the cause of action herein involved, namely, a cause of action for deceit or fraud, survives.

Section 11,235 of the General Code of Ohio, formerly section 4975 of the Rev. Stats. of Ohio, provides:

"In addition to the causes which survive at common law, causes of action for mesne profits, or injuries to the person or property, or for deceit or fraud, also shall survive; and the action may be brought notwithstanding the death of the person entitled or liable thereto."

This section states, as will be observed, that causes of action for "mesne profits, or injuries to the person or property, or for deceit or fraud," are survivable actions. If any action for deceit or fraud is a survivable action in Ohio, it is an assignable cause of action for the purposes of this inquiry.

What constitutes fraud has been ably considered by Chief Justice Fuller, in delivering the opinion of the Supreme Court in the case of Moore v. Crawford, 130 U. S. 128, 9 Sup. Ct. 448, 32 L. Ed. 878. The Chief Justice said:

"Fraud indeed, in the sense of a court of equity properly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence justly reposed and are injurious to another, or by which an undue and unconscientious advantage is taken of another. And courts of equity will not only interfere in cases of fraud to set aside acts done, but they will also, if acts have by fraud been prevented from being done by the parties, interfere and treat the case exactly as if the acts had been done."

Considering the provisions of the Ohio statute and the language of this opinion, in my opinion the fraudulent acts complained of in the bills herein are plainly within the contemplation of the provisions of the Ohio statute.

The bills which have been demurred to in cases Nos. 8,214 and 8,215 endeavor to make a cause of action for a rescission for fraud, by reason of assignment, the basis of the actions instituted. In view of the statute and the Supreme Court decision I have referred to,

I am of the opinion that such a cause of action is contemplated. This seems to be also the opinion held by the courts of Ohio in the case of Isham v. Buckeye Stave Co., 25 Ohio Cir. Ct. R. 167, and affirmed without report in 72 Ohio St. 660, 76 N. E. 1126. This was an action for the rescission of a contract for the sale of growing timber for fraud inducing the making of said contract, which fraud was not discovered by the decedent in his lifetime. The court held that there was no question but that the cause of action survived to the personal representative and not to the devisee, and this was their conclusion, inasmuch as the subject-matter of the contract was personal property.

· If a cause of action for fraud is assignable, surely the remedy of redressing the wrong passes. It is certainly within the contemplation of all rules of equity that the remedies for the redressing of the wrong must pass with the cause of action. The remedy surviving with the cause of action, the assignee of the cause of action has the right to elect between remedies. The election is not personal, but passes with the cause of action. This doctrine was approved by the Court of Appeals of this jurisdiction in the recent case of Berry v. Chase, 179 Fed. 427, 102 C. C. A. 573; Judge Knappen, delivering the opinion of the court, holding:

"The owner of a debt upon which he had the right to sue a principal or his agent through whom the debt was contracted, the principal being then undisclosed, in assigning the debt may also transfer to the assignee such right of election."

In this opinion the case of Reeder Bros. Shoe Co. v. Prylinski, 102 Mich. 468, 471, 60 N. W. 969, was cited with approval; that case holding that the assignee of a vendor's account for goods sold could, upon discovery of the fraud inducing the sale, rescind the same and recover the goods sold.

Inasmuch as the Ohio law permits the survivability and assignability of causes of action for fraud, cases from other jurisdictions where the basic law is otherwise are of no importance in connection with these demurrers. A cause of action for fraud may be a valuable asset, and, as the assets of the steamship company originally formed were disposed of to the complainant herein, it would follow that this cause of action, based upon fraud, together with its remedies, passed to the complainant.

That this chose in action is recognized as property is evident from the opinion of Judge Spear in the case of Reece v. Kyle, 49 Ohio St. 475, 484, 31 N. E. 747, 750 (16 L. R. A. 723) The judge says:

"It is difficult at best to reconcile the strict law of maintenance and champerty with our ideas of the rights of property, and the right of the citizen to contract. Among the fundamental rights is the right to acquire, possess, and dispose of property. The right of disposition necessarily inheres in the right of ownership. We are taught that a chose in action is as much property as a thing in possession, and that in this day the right to dispose of such property is as high and free from doubt as is the right to sell the horse, or farm, of which the seller has manual possession."

This being the attitude of the highest court of the state of Ohio, and the obligation resting upon me to follow the law of Ohio in respect to

the question of assignability, it seems plain to me that this action for fraud is assignable, having survivability, and with the assignment of the cause of action carries with it the remedy of rescission.

Taking the views of the questions raised by the demurrers which I have heretofore indicated, the demurrers are, accordingly, overruled.